ARIEL E. STERN, ESQ.
Nevada Bar No. 8276
ALLISON R. SCHMIDT, ESQ.
Nevada Bar No. 10743
AKERMAN LLP
1160 Town Center Drive, Suite 330
Las Vegas, Nevada 89144
Telephone:    (702) 634-5000
Facsimile:    (702) 380-8572
Email: ariel.stern@akerman.com
Email: allison.schmidt@akerman.com

*Attorneys for Defendants Nationstar Mortgage,
LLC and Bank of America, N.A.*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| MICHAEL BONDI, | Case No.: 2:14-cv-01215-LDG-GWF |
| Plaintiff, | |
| v. | |
| NATIONSTAR MORTGAGE LLC, a Delaware limited liability company; BANK OF AMERICA, N.A., DOES I-X , inclusive, and ROE CORPORATIONS I-X, inclusive, | **BANK OF AMERICA, N.A.'S MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |

Defendant Bank of America, N.A. (**BANA**) moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for the Court to enter summary judgment in favor of BANA as follows:

…

…

…

…

**AKERMAN LLP**
1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA, 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION.

Plaintiff Michael Bondi (**Bondi**) obtained first and second mortgage loans totaling $348,990.00 to finance his purchase of real property located in Las Vegas. Bondi admits that he failed to repay those loans as promised.  Nevertheless, Bondi now brings this lawsuit against BANA and Nationstar Mortgage LLC (**Nationstar**) based on the contention that BANA agreed to forgive the amount owed on the second of these loans.  However, Bondi has no evidence showing that BANA agreed to forgive this loan on which it was entitled to repayment.  Instead, the undisputed evidence shows that Bondi failed to repay this loan and seeks to avoid the consequences of that failure through this lawsuit.  Accordingly, BANA is entitled to summary judgment in its favor on each of Bondi's claims for (1) violation of the Fair Debt Collection Practices Act (**FDCPA**), (2) violation of the Fair Credit Reporting Act (**FCRA**), (3) fraud and misrepresentation, and (4) civil conspiracy.

### II.   STATEMENT OF FACTS.

Plaintiff purchased the property at 9332 Golden Grape Court, Las Vegas, Nevada on or about August 7, 2006.  *See* Deed, **Exhibit A**.  To finance the purchase, Bondi obtained a first loan in the amount of $279,192.00 from CCSF, LLC dba Greystone Financial Group (**Greystone**).  The first loan was secured by a senior deed of trust.  *See* Affidavit of Matthew Carillo (**Aff.**), **Exhibit B, ¶¶** 4-9; Deposition of M.Bondi, **Exhibit C**, at 11:8-10.  Bondi also obtained a second loan in the amount of $69,798.00 from Greystone, which was secured by a junior deed of trust recorded against the property.  Aff. ¶¶ 4-9.

…

…

…

…

…

Bondi defaulted on his first mortgage by failing to make the payment due on February 1, 2008.  Aff. ¶¶ 9-11; Exs. E, G to Aff.  As a result, the beneficiary under the first deed of trust initiated foreclosure proceedings by recording a Notice of Default against the property on August 8, 2008.  Aff. ¶ 11; Ex. G to Aff.  Bondi did not cure his default, and on March 5, 2009, ReconTrust recorded a Notice of Trustee's Sale.  Aff. ¶ 12; Ex. H to Aff.  The property reverted to the Bank of New York Mellon, fka the Bank of New York, as Trustee for the Certificateholders CWALT, Inc., Alternative Loan Trust 2006-OC8, Mortgage Pass-Through Certificates, Series 2006-OC8 (**BNYM**) at the trustee's sale on June 4, 2009.  *See* Aff. ¶ 13; Ex. I to Aff.  BNYM was owed $314,064.46 on the first mortgage loan.  Aff. ¶ 15.  The foreclosure sale realized $160,565.00 in proceeds.  *Id.* ¶ 16.  Following the trustee's sale, BANA canceled the unpaid debt remaining on Bondi's first lien mortgage and issued a 1099-C to Bondi evidencing this cancelation.  Aff. ¶ 16; Ex. J to Aff.  BANA also adjusted the principal balance on the first loan to show that loan as having a zero balance on March 25, 2010.  Aff. ¶ 17; Ex. E to Aff.

…

…

…

…

…

…

…

…

…

…

…

…

…

Bondi also fell into default on his second mortgage in 2008. *Id.* ¶ 10; Ex. F to Aff.  Because no excess proceeds remained after the trustee's sale, none of the sale proceeds were applied to the amount owed on the second mortgage. Aff. ¶ 18; Ex. F to Aff.  The last payment made on the second mortgage was received in January 2008. Aff. ¶ 19; Ex. F to Aff.  BANA has not received any payment on the second loan since that time. *Id.*  As the second loan remained due and owing, BANA transferred servicing of this loan to Nationstar Mortgage, LLC (**Nationstar**) effective July 16, 2013. Aff. ¶ 25; Ex. N to Aff.  From the time the last payment was received until the service transfer, the unpaid principal balance on the second loan was $69,371.26. Aff. ¶ 26; Exs. F, N, O to Aff.  BANA has no record that it ever reached an agreement with Bondi to forgive the balance owed on this loan, and Bondi admits that he never repaid the loan in full. Aff. ¶ 29; Ex. C, at 26:17-18.  Accordingly, BANA reported to the credit reporting agencies that this loan was in default from February 2008 through March 2010 and from August 2010 through October 2011. Aff. ¶ 30.  On November 14, 2011, however, BANA received notice of a dispute from a credit reporting agency advising that Bondi had challenged BANA's credit reporting on the second loan. Aff. ¶ 31; Ex. K to Aff.  After reviewing its records on the second loan, BANA updated its credit reporting on this loan on November 15, 2011, to show the loan as "not reported" for the months of November 2009 through November 2011. Aff. ¶¶ 33-34; Ex. K to Aff.  BANA continued to report the loan as "not reported" each month from December 2011 until the service transfer to Nationstar. *Id.* ¶ 30.  Following the service transfer, BANA reported the account as "transferred to another lender." *Id.*

…

…

…

…

…

4

Bondi's claims in this action revolve around the second loan. *See* Bondi's Interrogatory Responses, **Exhibit D,** at 7**;** Ex. C, at 13:1-6. Bondi contends that BANA agreed to forgive the amount owed on the second loan. Ex. C, at 15:4-22. When asked to describe the terms of this agreement, however, Bondi admits that the discussions he had with BANA concerned the credit reporting on the second loan rather than a release of his liability for repaying the debt. Specifically, Bondi stated that he contacted several people at BANA regarding his "***credit reporting*** problems with BANA" and that BANA agreed to look into the ***credit reporting*** on the loan and correct any problems. Ex. D at 3 (emphasis added). Similarly, in his deposition, Bondi confirmed that his discussions with BANA focused on the credit reporting on the second loan, not on Bondi's liability for the debt:

> Q: And did Bank of America ask for you to give them anything or make any promises to them in exchange for their agreement to forgive the balance?
>
> A: Some of the representatives that I had talked to – I had basically started talking to them about, you know, suing them for the irregular credit reporting that they were doing and the discovery of the creditors insurance, things like that. And they basically had said, Well, if you're not going to sue us, ***we'll update your credit report and we'll fix it, and we'll investigate i***t. And I said, Okay. Fine. And during that six or seven-month process between April and     November of 2010, ***I just thought everything was being worked out. And then when I started seeing my credit reports being reported as zero balance, I took that that everything was being agreed to.***
>
> Q: And in the secured e-mails, did a Bank of America representative specifically say that they would waive their right to collect on the second?
>
> A: ***More or less***, yes. I had looked at some of the letters and e-mails, and ***I interpret*** those as full release letters, yes. Especially over the amount of times and especially with the actions that subsequently resulted in almost four years of zero balance credit reporting, so yes. I definitely believe that.
>
> Q: Did Bank of America ask you to sign a written agreement that you wouldn't sue them if they didn't seek collection on the second?
>
> A: No, I don't believe so.

…

…

AKERMAN LLP
1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

AKERMAN LLP
1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

Ex. C, at 16:1-17:4 (emphasis added).  In other words, Bondi *assumed* that because BANA updated the credit reporting on the second loan, BANA also agreed to forgive the debt Bondi owed.  Bondi, however, has no evidence, other than his own belief, showing that BANA accepted an offer from Bondi to release him from liability on the loan:

> Q: And the agreement where Bank of America agreed to forgive the amount on the second, was that in writing?
>
> A: Yes, it was.
>
> Q: And have you produced a copy of that to your attorney?
>
> A: I produced what I believe were several secure Bank of America e-mails that I no longer have access to.  ***But nothing specifically other than credit reports that indicate that I did have a zero balance***.

*Id.* at 15:13-22.

Based on his erroneous belief that BANA agreed to forgive the balance owed on the second loan, Bondi brings claims against BANA for (1) violation of the FDCPA, (2) violation of FCRA, (3) fraud, (4) misrepresentation, and (5) civil conspiracy.  Because the undisputed evidence shows that Bondi cannot prove the essential elements of these claims, the Court should grant summary judgment in BANA's favor.

…

…

…

…

…

…

…

…

…

…

6

**III.   LEGAL STANDARD.**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56.  The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *See Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982), cert. denied, 460 U.S. 1085 (1983). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982) (citing *U.S. v. First Nat'l Bank*, 652 F.2d 882, 887 (9th Cir. 1981)). "[W]hen a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

**IV.   LEGAL ARGUMENT.**

**A.   BANA is Entitled to Summary Judgment in its Favor on Bondi's Fair Debt Collection Practices Act Claim.**

Bondi identifies four actions that be believes violated the FDCPA: (1) representing to Nationstar that plaintiff owed a debt after confirming plaintiff had a zero balance; (2) communicating to the consumer reporting agencies that plaintiff still owed a balance on the loan; (3) using false representations as to the balance owed on the account; and (4) implying in a letter that Bondi made fraudulent misrepresentations on his loan application.  ECF No. 27 ¶¶ 29-32; Ex. C, at 28:13-31:8.

…

…

…

…

…

AKERMAN LLP
1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

AKERMAN LLP
1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA, 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

1  Bondi's FDCPA claim fails because BANA is not a debt collector subject to the FDCPA, and

2  the evidence shows that BANA did not misrepresent that status of Bondi's debt.   Further, any

3  statements that BANA made in response to a complaint from Bondi are not a debt collection activity

4  and cannot form the basis for an FDCPA claim. To state a claim for violation of the FDCPA, a

5  plaintiff must establish (1) that the defendant is a debt collector under the FDCPA, (2) that the

6  defendant engaged in debt collection activity, and (3) the defendant violated a provision of the

7  FDCPA. *See* 15 U.S.C. § 1692k; *Spartalian v. Citibank, N.A*., 2:12-CV-00742-MMD, 2013 WL

8  593350, at *3 (D. Nev. Sept. 27, 2013).   Because the evidence shows that these elements are not

9  met, BANA is entitled to summary judgment in its favor on this claim.

10                            *1.*       ***BANA is Not a Debt Collector under the FDCPA.***

11  "A 'debt collector' under the FDCPA is a person who collects or attempts to collect debts

12  owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6).  This definition excludes

13  a creditor from liability under the FDCPA for attempting to collect its own debt.  *See*, *e.g.*, *McCurdy*

14  *v. Wells Fargo Bank, N.A*., No. 2:10-cv-880 RLH, 2010 WL 4102943, at *3 (D. Nev. Oct. 18, 2010).

15  Accordingly, a loan servicer such as BANA is only a debt collector under the FDCPA if it acquires

16  servicing rights to the loan after the loan is in default. *Huck v. Countrywide Home Loans, Inc*., 3:09-

17  CV-553 JCM VPC, 2011 WL 3274041, at *2 (D. Nev. July 29, 2011).

18  …

19  …

20  …

21  …

22  …

23  …

24  …

25  …

26  …

AKERMAN LLP

1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA, 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

Here, the undisputed evidence shows that BANA is not a debt collector under the FDCPA because it gained its servicing rights to the loan through its merger with BAC Home Loans Servicing, LP (**BACHLS**), formerly known as Countrywide Home Loans Servicing, LP (**CHLS**). (Aff., ¶¶ 20-24.)  CHLS began servicing the loan as early as September 14, 2006, but Bondi did not default on the loan until 2008.  Aff., ¶ 10; Ex. F to Aff.)  In other words, BANA's predecessors, and therefore BANA, acquired servicing rights with respect to the Loan prior to the Loan becoming in default.  Accordingly, the loan was not in default when BANA took over servicing, and BANA is not a debt collector subject to liability under the FDCPA.  *See Brown v. Morris,* 243 F.App'x 31, 34 (5th Cir. 2007) (when defendant acquires debt though its merger with previous creditor of plaintiff rather than via specific assignment, debt was not "obtained" while it was in default and defendant was not a debt collector under FDCPA); *Esquivel v. Bank of Am., N.A.,* 2:12-CV-02502-GEB, 2013 WL 682925, at *2 (E.D. Cal. Feb. 21, 2013) ("since [BANA] 'obtained' the debt when its predecessor in interest, [BACHLS], obtained the debt, neither Defendant is a 'debt collector' under the FDCPA."); *Forester v. Bank of America, N.A.,* No. 11–0160–CG–M, 2012 WL 3206471, at *7 (S.D. Ala. Aug. 7, 2012) (even though it obtained plaintiff's debt through assignment when plaintiff's loan was already in default, where Countrywide merged into BACHLS, BACHLS was not a debt collector under FDCPA).

Ultimately, because BANA's predecessors serviced the loan at issue prior to default, BANA is not a debt collector under the FDCPA, and Plaintiff cannot submit evidence proving an essential element of his FDCPA claim. Accordingly, judgment should be entered in favor of BANA with respect to this claim.

…

…

…

## 2. The FDCPA's One-Year Statute of Limitations Bars this Claim.

Even if BANA were a debt collector subject to the FDCPA, this claim would nevertheless fail. Bondi contends that BANA violated the FDCPA by representing to the credit reporting agencies and to Nationstar that Bondi still owed a balance on the account. Under the FDCPA, "[a]n action to enforce any liability created by this subchapter may be brought … within one year from the date on which the violation occurs." 15 U.S.C. § 1692k(d); *see also Townsend v. Chase Bank USA, N.A.*, 445 Fed. Appx. 920, 921 (9th Cir. 2011).

Bondi filed the instant action on July 25, 2014. ECF No. 1. BANA last reported information regarding the Loan to the credit reporting agencies in October 2011. *See* Aff. ¶ 30. Furthermore, despite producing multiple credit reports to BANA in discovery in this matter, Bondi did not produce a single credit reported dated after July 25, 2013, that shows that BANA reported the loan as having a balance. The statute of limitations also bars this claim to the extent it is based on allegations that BANA misrepresented to Nationstar that a balance was owed on the account. BANA notified Bondi of the impending service transfer on June 24, 2013, and the service transfer occurred on July 16, 2013. Ex. N to Aff. Accordingly, Bondi was required to bring any FDCPA claim based on allegations that BANA misrepresented the status of debt to Nationstar by July 16, 2014, at the absolute latest. Because Bondi did not file his claims until July 25, 2014, BANA is entitled to summary judgment in its favor on the FDCPA claim.

…

…

…

…

…

10

AKERMAN LLP
1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA, 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

### 3. *Bondi Cannot Show that BANA Engaged in Debt Collection Activity under the FDCPA by Implying that Bondi Misrepresented Facts on His Loan Application.*

Bondi also based this claim on allegations that BANA wrongfully implied he made fraudulent misrepresentations on his loan application. (ECF No. 27 ¶ 32.) In discovery, Bondi clarified that this claim is based on a letter dated July 12, 2014 that he received from Leah Peregrine. Ex. D at 13-14; Ex. C, at 30:8-30:23. This letter, however, was not made in connection with an attempt to collect a debt and was therefore not subject to the FDCPA.

In addition to showing that a defendant is a debt collector, a plaintiff seeking to recover for an FDCPA violation must also prove that the communication to which the plaintiff objects was a "debt collection activity" made "in connection with the collection of any debt." 15 U.S.C. § 1692e; *Spartalian*, 2013 WL 593350, at *3. However, "the statute does not apply to *every* communication between a debt collector and a debtor." *Gburek v. Litton Loan Servicing LP*, 614 F.3d 380, 385 (7th Cir. 2010) (emphasis in original)). For a communication to fall under the FDCPA, "an animating purpose of the communication must be to induce payment by the debtor." *Grden v. Leikin Ingber & Winters PC,* 643 F.3d 169, 173 (6th Cir. 2011); *see also McIvor v. Credit Control Servs., Inc.*, 773 F.3d 909, 914 (8th Cir. 2014); *Walcker v. SN Commercial, LLC*, 286 Fed. Appx. 455, 457 (9th Cir. 2008). Accordingly, communications that merely inform the debtor of the debt's status or respond to debtor inquiries regarding the loan are not communications that fall within the purview of the FDCPA. *See Grden*, 643 F.3d at 173 ("[T]he decisive point is that [the defendant] made the balance statements only after [the plaintiff] called and asked for them.")

…

…

…

…

…

…

11

AKERMAN LLP

1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA, 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

1    To determine whether a communication is a debt collection activity, courts weigh a variety of

2    factors, including whether the communication included an explicit demand for payment. *Grden*, 643

3    F.3d at 173. Courts will also consider whether the loan is in default. *Gburek*, 614 F.3d at 385.

4    Further, courts consider whether any payment dates listed in the communication are prospective,

5    simply warning the debtor of the consequences of missing a future payment. *Bailey v. Sec. Nat'l*

6    *Servicing Corp.*, 154 F.3d 384, 389 (7th Cir. 1998). "The nature of the parties' relationship is also

7    relevant." *Gburek*, 614 F.3d at 385. Lastly, communications that "merely inform" the debtor of the

8    current status of a debt are not debt collection activities. *Bailey*, 154 F.3d at 38-89; *Grden*, 643 F.3d

9    at 173.

10    Applying these factors, the letter on which Bondi bases this claim was not sent in connection

11    with an attempt to collect a debt and is therefore not within the purview of the FDCPA. *See* July 12,

12    2014 letter to M.Bondi, **Exhibit E**. First, this letter does not demand payment from Bondi or even

13    identify the amount owed on the account. *See id*. Further, the letter points out that BANA had

14    previously transferred the servicing of the loan to Nationstar, meaning that the relationship between

15    Bondi and BANA was no longer a debtor-creditor relationship, and payments on the loan would no

16    longer be made to BANA. *Id*. Lastly, the letter explicitly states that it was sent in response to

17    correspondence received from the office of a U.S. senator on behalf of Bondi. *Id*. It cannot be said

18    that an "animating purpose" of this letter was to induce Bondi to make a payment on the loan.

19    Rather, the letter was a "ministerial response to a debtor inquiry, rather than part of a strategy to

20    make payment more likely." *Grden*, 643 F.3d at 173. For this reason, the Court should grant

21    summary judgment in favor of BANA on this issue.

22    …

23    …

24    …

25    …

26

### 4.    *BANA Did Not Violate the FDCPA Because Bondi Owed the Debt.*

Lastly, Bondi's allegations that BANA misrepresented that he owed a balance on the second loan are contrary to the evidence.  Bondi owed the second loan, as BANA never waived that debt, and the foreclosure proceeds were insufficient to satisfy it.  *See* Aff. ¶¶ 14-19.  Bondi has no admissible evidence to show BANA waived enforcement of the second loan, and he admits that he did not repay the loan in full.  Further, Bondi admits that the FDCPA claim is based only on his personal interpretation of BANA's communications:

> Q.    And in the secured e-mails, did a Bank of America representative specifically say that they would waive their right to collect on the second?
>
> A.    More or less, yes.  I had looked at some of the letters and e-mails, and ***I interpret those as full release letters***, yes.  Especially over the amount of times and especially with the actions that subsequently resulted in almost four years of zero balance credit reporting.  I definitely ***believe*** that.

*See* Ex. C, at 16:17-25 (emphasis added).  Bondi also admits that the discussions he had with BANA related to BANA's credit reporting on the second, not to his liability for the debt.  When asked to describe the terms of the purported agreement, Bondi stated that he contacted several people at BANA regarding his "***credit reporting*** problems with BANA" and that BANA agreed to look into the ***credit reporting*** on the loan and correct any problems.  Ex. D at 3 (emphasis added).  Similarly, Bondi stated in his deposition:

> A:    Some of the representatives that I had talked to – I had basically started talking to them about, you know, ***suing them for the irregular credit reporting*** that they were doing and the discovery of the creditors insurance, things like that.  And they   basically had said, Well, if you're not going to sue us, ***we'll update your credit    report and we'll fix it, and we'll investigate***   it.  And I said, Okay.  Fine.  And during that six or seven-month process between April and November of 2010, ***I just thought everything was being worked out.  And then when I started seeing my credit reports being reported as zero balance, I took that that everything was being agreed to.***

Ex. C, at 16:1-17:4 (emphasis added).

AKERMAN LLP

1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA, 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

13

AKERMAN LLP
1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

Bondi produced no evidence, including letters or other writings, showing that BANA actually agreed to forego its right to enforce on the second loan.  Bondi's subjective interpretation is irrelevant; it is BANA's actual intent—not Bondi's subjective interpretation of it—that matters. Bondi has no evidence that BANA intentionally and knowingly waived its right to enforce the second loan.  To the contrary, the servicing records show the debt was active and owing in July 2013, when it was transferred to Nationstar.  *See* Exs. F, N, O to Aff.  Bondi never refuted this testimony with admissible evidence to the contrary.  Lacking any admissible evidence that BANA waived enforcement of the second loan, Bondi cannot succeed on his FDCPA claim.

**B.      Bondi's Claim for Violation of the Fair Credit Reporting Act Fails.**

Bondi's second cause of action is a claim for violation of the Fair Credit Reporting Act (**FCRA**).  This claim fails as to BANA because the undisputed facts show that BANA did not report inaccurate information regarding the Loan to the credit reporting agencies (**CRA's**) and complied with its obligations under the FCRA.  Further, Bondi did not file a notice of dispute concerning any reporting BANA made on the second loan in 2013 and cannot therefore not bring a claim based on allegations that this reporting was inaccurate.  The Court should grant summary judgment in BANA's favor on this claim.

…

…

…

…

…

…

…

…

…

…

14

AKERMAN LLP
1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA, 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

The FCRA imposes obligations on persons or entities, such as creditors, that "furnish" information to credit reporting agencies. *See* 15 U.S.C. § 1681s-2. There are two components to a furnisher's obligations under Section 1681s-2 of the FCRA. Subsection (a) of Section 1681s-2 sets forth a furnisher's duty to report "accurate information" to the credit reporting agencies. Subsection (b) of Section 1681s-2 sets forth a furnisher's duty to conduct an investigation in response to a notice of dispute from a credit reporting agency. Although furnishers have obligations under both subsections, only subsection (b) contains a private right of action. *See Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1162 (9th Cir. 2009). A plaintiff may not bring a claim against a furnisher of information for alleged violation of 15 U.S.C. § 1681s-2(a) because no private right of action exists under this section. *Nelson v. Chase Manhattan Mortg. Corp.*, 282 F.3d 1057, 1060 (9th Cir. 2002).

### 1.     *FCRA's Two-Year Statute of Limitations Bars this Claim.*

The FCRA requires plaintiffs to file claims for relief "not later than the earlier of—(1) 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or (2) 5 years after the date on which the violation that is the basis for such liability occurs." 15 U.S.C. § 1681p. However, the duties found in subsection (b) of 15 U.S.C. § 1681s-2 are only triggered upon receipt of a notice of dispute from a CRA to the furnisher of credit information. *See* 15 U.S.C. § 1681s-2(b)(1); *see also Gorman,* 584 F.3d at 1154 ("These duties arise only after the furnisher receives notice of dispute from a CRA . . . ."). In other words, a furnisher of credit information can only face FCRA liability if it received a notice of dispute regarding the credit reporting at issue.

…

…

…

…

…

…

15

AKERMAN LLP
1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

Here, BANA received only one notice of dispute regarding its reporting on the second loan, which it received on November 14, 2011.  Aff. ¶¶ 31, 35.  In response to the dispute, BANA modified its reporting on November 15, 2011.  Aff. ¶ 33.  Bondi admits these updates were made and that he had no issues with his credit reporting from November 2010 until May 2014.  Ex. D at 4; Ex C, at 16:14-16.  Accordingly, Bondi was aware of BANA's response to the notice of dispute, and the FCRA's two-year statute of limitations bars this claim because Bondi did not bring it within two years of his discovery of the alleged violation.  BANA is entitled to summary judgment in its favor on this claim.

> **2.**      ***Bondi Admits that BANA Updated its Credit Reporting on the Second Loan after the November 2011 Notice of Dispute.***

BANA is entitled to summary judgment in its favor to the extent Bondi bases this claim on allegations regarding BANA's investigation following the notice of dispute filed in November 2011 because the facts show that BANA complied with any obligation it had to modify its credit reporting following receipt of the notice of dispute.

…

…

…

…

…

…

…

…

…

…

…

…

AKERMAN LLP

1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

Subsection (b) of section 1681s-2 contains additional obligations on furnishers which are triggered by the receipt of notice of dispute under section 1681i(a)(2). 15 U.S.C. § 1681s-2(b)(1). Section 1681i governs the procedure in a case of disputed accuracy. It provides:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a [CRA] is disputed by the consumer and the consumer notifies the [CRA] directly, or indirectly through a reseller, of such dispute, the [CRA] shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller.

15 U.S.C.§ 1681i(a)(1)(A). It goes on to state: "Before the expiration of the 5-business-day period beginning on the date on which a [CRA] receives notice of a dispute from any consumer or a reseller in accordance with paragraph (1), the [CRA] shall provide notification of the dispute to any person who provided any item of information in dispute, at the address and in the manner established with the person. The notice shall include all relevant information regarding the dispute that the agency has received from the consumer or reseller." 15 U.S.C. § 1681i(a)(2)(A).

Thus, when a furnisher receives notice from a CRA pursuant to section 1681i(a)(2) of a dispute regarding the completeness or accuracy of information provided by the furnisher to a CRA, the furnisher is required to:

> (A) conduct an investigation with respect to the disputed information;
> (B) review all relevant information provided by the [CRA] pursuant to section 1681i(a)(2) of this title;
> (C) report the results of the investigation to the [CRA];
> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
> (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly-
> > (i) modify that item of information;
> > (ii) delete that item of information; or
> > (iii) permanently block the reporting of that item of information.

15 U.S.C.§ 1681s-2(b)(1)(A)-(E).

AKERMAN LLP
1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

Here, the undisputed evidence shows that BANA complied with any obligation it may have had to update its credit reporting on Bondi's second loan following receipt of the November 2011 notice of dispute.   On November 14, 2011, BANA received notice of a dispute from a credit reporting agency advising that Bondi had challenged BANA's credit reporting on the second loan. Aff. ¶ 31; Ex. K to Aff.  After reviewing its records on the second loan, BANA updated its credit reporting on this loan on November 15, 2011, to show the loan as "not reported" for the months of November 2009 through November 2011.  Aff. ¶¶ 33-34; Ex. K to Aff.  Bondi agrees that he had no issue with BANA's credit reporting on the second loan after BANA made this change.  When asked to identify the inaccurate reporting on the Second Loan, Bondi responded as follows:

> Q:   With respect to the credit reporting, when did you believe that Bank of America first reported incorrectly, approximately?
>
> A:   July of '09, right after the foreclosure.
>
> Q:   What was the inaccurate reporting in July of 2009?
>
> A:   It kept showing me as missing monthly payments rather than it being a foreclosed property. So it kept showing as an open foreclosure, but missing the payments consecutively for – I would say at least a year after the foreclosure, and that's what started the conversations in April of 2010.  So I would say from July of '09 to April of 2010, if not longer, those reports were inaccurate.
>
> Q:   And when was that resolved, with at least Bank of America?
>
> A:   I believe like November of 2010 with a reporting of December 2010.

Ex. C, at 19:6-20:1.  Bondi further verified in response to an interrogatory that "[s]ince my credit report was updated after November 2010, I did not have to file any disputes from November 2010 until May 2014 when Nationstar Mortgage, LLC started to report the charge off on my credit report in May 2014."  Ex. D, at 4.  In other words, Bondi admits that BANA corrected whatever errors he believed existed prior to the November 2011 notice of dispute.

…

…

AKERMAN LLP

1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

1    The undisputed evidence shows that BANA complied with its obligations under 15 U.S.C.§

2    1681s-2(b)(1) by promptly modifying the credit reporting that Bondi challenged.  BANA received

3    Bondi's notice of dispute on November 14, 2011, and BANA modified its reporting one day later, on

4    November 15, 2011.  Aff. ¶¶ 31-34.  Under these circumstances, Bondi cannot show that BANA

5    violated the FCRA, and the Court should grant summary judgment in favor of BANA.

6             **3.      *Bondi Did Not File a Notice of Dispute Regarding BANA's Reporting on
                        the Loan in 2013.***

7             The only notice of dispute BANA received on the second loan was received on November

8    14, 2011.  Aff. ¶¶ 31, 35.  Nevertheless, Bondi bases his FCRA claim at least in part on his belief

9    that BANA incorrectly reported on the loan in August 2013:

10           Q:    And has Bank of America done any incorrect reporting
                   following that time period that you are aware of?

11           A:    Following which time frame?

12           Q:    Following the resolution in November, December of 2010.

13           A:    Yes. I would say – I would estimate probably, what, in August
                   of 2013 they   started reporting it as – instead of it a closed
                   zero balance, it was now  transferred to another servicer.

14   Ex. C, at 20:2-11.

15           However, the duties found in subsection (b) of 15 U.S.C. § 1681s-2 are only triggered upon

16   receipt of a notice of dispute from a CRA to the furnisher of credit information.  *See* 15 U.S.C. §

17   1681s-2(b)(1); *see also Gorman,* 584 F.3d at 1154 ("These duties arise only after the furnisher

18   receives notice of dispute from a CRA . . . .").  As a result, Bondi has no claim for credit reporting

19   for which BANA did not receive a notice of dispute.  Since BANA did not receive a notice of

20   dispute regarding any credit reporting that it furnished on the second loan after November 2011, any

21   FCRA claim based on reporting in 2013 fails as a matter of law.  BANA is entitled to summary

22   judgment in its favor on this claim.

23   …

24   …

AKERMAN LLP
1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA, 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

**4.       Bondi Cannot Show that BANA's Reporting Was Inaccurate.**

Lastly, Bondi's FCRA claim fails because the evidence shows that BANA's reporting on the second loan was accurate.   To succeed on an FCRA claim, a plaintiff must first show that an inaccuracy existed in his credit reports.  *Carvalho v. Equifax Information Services, LLC*, 629 F.3d 876, 890  (9th Cir. 2010) (holding that although the FCRA "does not on its face require that an actual inaccuracy exist for a plaintiff to state a claim, many courts, including our own, have imposed such a requirement"); *Kruse v. Experian Information Solutions, Inc.*, 471 Fed. Appx. 714, 715 (9th Cir. 2012) (holding that inaccuracies in credit report were required to maintain FCRA claim).   In other words, if BANA did not furnish inaccurate information, then it cannot be liable to Bondi for violation of FCRA.

Here, the undisputed facts show that BANA's reporting on the second loan was accurate. The last payment on the loan was received on January 31, 2008.  BANA received no payments on the loan after that time.  Ex. F to Aff.  Bondi admits that he did not pay the loan in full and has not produced any evidence that he made payment or that BANA received payment after January 2008. Ex. C, at 26:17-18.  BANA reported the loan as thirty days past due in February 2008, sixty days past due in March 2008, ninety days past due in April 2008, 120 days past due in May 2008, 150 days past due in June 2008, and 180 days past due from July 2008 through March 2010, and again from August 2010 through October 2011.  Aff. ¶ 30.  BANA did not report any information on the loan from April 2010 through July 2010 or from November 2011 through July 2013.  *Id*.  Given the undisputed evidence that Bondi was not making payments on the loan during this time, this reporting was not inaccurate.  Further, BANA in fact did transfer servicing of the loan to Nationstar in July 2013 (Aff. ¶ 25), and its reporting in August 2013 that the account was "transferred to another lender" is likewise not inaccurate.  *See* Ex. N to Aff.  BANA is entitled to judgment in its favor on Bondi's FCRA claim for this reason as well.

…

**C.    Bondi's Fraud and Misrepresentation Claims Are Preempted to the Extent They Are Based on BANA's Credit Reporting, and the Evidence Shows that Essential Elements of These Claims Are Lacking.**

BANA is entitled to summary judgment on Bondi's fraud and misrepresentation claims because the FCRA preempts these claims, and the undisputed evidence shows that essential elements of these claims are not met.

### 1.    *The FCRA Preempts These Claims.*

Bondi's complaint asserts that "defendants" provided false information to credit reporting agencies with the intent of having the credit reporting agencies rely on the allegedly false information. ECF No. 27 ¶¶ 49-52; 57-60.  Bondi also clarified in discovery that he believes "[t]he false representations of fact impacted my ability to obtain credit and prevented me from applying for additional credit for which I should have been approved without the false negative credit reporting of a balance of $69,371.26."  Ex. D at 14.  Bondi's fraud and misrepresentation claims are a mere attempt to plead purported FCRA violations as a common law fraud claims.

The FCRA, however, preempts a plaintiff from bringing any state law claim based on conduct covered by Section 1681 s-2.  Section 1681t(b) provides in pertinent part that "[n]o requirement or prohibition may be imposed under the laws of any State ... with respect to any subject matter regulated under ... section 1681s–2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies . . . ."  15 U.S.C. § 1681t(b).  For purposes of preemption, state law tort claims are "requirements" and therefore preempted by FCRA.  *Aleshire v. Harris, N.A.*, 586 Fed. Appx. 668, 671 (7th Cir. 2013) (internal citations omitted); *see also Premium Mortgage Corp. v. Equifax, Inc.*, 583 F.3d 103, 106-07 (2d Cir. 2009); *Trout v. BMW of N. Ameirca*, 2:04-cv-01466-BES-LRL, 2007 WL 602230, at *2 (D. Nev. Feb. 20, 2007) ("In sum, furnishers of information cannot provide inaccurate information, but if they do, any state statutory and common law causes of action brought as a result of this conduct are preempted by the FCRA.").

…

…

AKERMAN LLP
1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

Accordingly, BANA is entitled to judgment in its favor on Bondi's fraud and misrepresentation claims to the extent these claims are based on allegations that BANA reported false information on the second to the credit reporting agencies.

### 2. Bondi Cannot Establish the Essential Elements of a Fraud Claim.

To the extent these claims are based on alleged misrepresentations other than credit reporting, the undisputed evidence nevertheless shows that Bondi cannot establish the elements of a fraud or misrepresentation claim. In discovery, Bondi identified three misrepresentations that he believes BANA made: (1) the statement in the letter advising him of the service transfer to Nationstar stating that the second loan had a balance of $69,371.26; (2) a letter from a BANA representative stating that BANA's records do not show an agreement to settle the loan or that the account has a zero balance; and (3) a letter from a BANA representative implying that Bondi included false information on his loan application. *See* Ex. D at 12-14. None of these alleged statements supports a claim for fraud, however.

To establish a claim for fraud, Bondi must prove (1) a false representation made by the defendant; (2) defendant's knowledge or belief that the representation is false; (3) defendant's intention to induce the plaintiff to act or to refrain from acting in reliance upon the misrepresentation; (4) justifiable reliance upon the misrepresentation; and (5) damage to the plaintiff resulting from such reliance. *Bulbman, Inc. v. Nevada Bell*, 825 P.2d 588, 592 (Nev. 1992).

…

…

…

…

…

AKERMAN LLP
1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

AKERMAN LLP
1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

**a.   The Statement that Bondi Owed a Balance on the Account.**

Bondi cannot show that any statement that he owed a balance on the second loan was false. BANA's business records on the loan establish that BANA did not receive any payment whatsoever on the loan after January 31, 2008, and that the unpaid principal balance on the loan was $69,371.26 from the time the last payment was received until servicing of the loan transferred to Nationstar.  Ex. F to Aff.; Ex. O to Aff. at 1.  Further, Bondi admits that he did not pay the loan in full and cannot present any evidence showing that BANA received additional payments on the loan after January 31, 2008, that would have changed the unpaid balance on the loan.  Ex. C, at 26:17-18.  Accordingly, BANA cannot establish that the balance on the loan was $69,371.26 was false.

Morever, Bondi cannot present evidence showing that BANA intended Bondi to act on this alleged misrepresentation or that Bondi justifiably relied on this representation.  When asked to explain the basis for this claim in discovery, Bondi explained:

> Q:   Did Bank of America make any false statements to you with respect to the   second loan?
>
> A:   Well, I mean, the false – the false statements would be towards Nationstar stating      that there's an outstanding debt.  As far as a false statement to me, no.
>
> Q:   Okay. So they made – Bank of America made a false representation to Nationstar that this money was owed and could be collected on?
>
> A:   Yes.

Ex. C, at 36:15-20; 39:9-12.

…

…

…

…

…

…

…

23

AKERMAN LLP

1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA, 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

1    Bondi, however, cannot recover for fraud based on statements made to someone other than

2    Bondi.  *Epperson v. Roloff*, 719 P.2d 799, 102 Nev. 206 (Nev. 1986) (stating "[t]he tort action of

3    deceit or misrepresentation requires the plaintiff to establish that the defendant made a false

4    representation to *him*…Further, the plaintiff must establish that the defendant intended to induce *the*

5    *plaintiff* to act or refrain from acting on the representation) (emphasis added).  Accordingly, since

6    Bondi has produced no evidence showing how *he* relied on a statement that a balance was owed on

7    the account, Bondi has failed to essential the elements of a claim for fraud, and the Court should

8    grant summary judgment in favor of BANA on this claim.  *See Bulbman*, 825 P.2d at 592.

9             **b.   Letter Stating that BANA's Records Do Not Show an Agreement to**
10                   **Settle the Loan or that the Account has a Zero Balance.**

11           Any fraud claim based on a letter stating that BANA's records do not reflect an agreement to

12   settle the account is similarly doomed.  The undisputed evidence shows that BANA's records do not

13   contain evidence of such an agreement and do not reflect that the account ever had a zero balance.

14   Aff. ¶¶ 27-29; Ex. F to Aff.; Ex. O to Aff. at 1.  Bondi cannot present any evidence that contradicts

15   this fact.  Accordingly, this statement was an accurate reflection of the information contained in

16   BANA's business records and cannot form the basis for a fraud claim.  Nor can Bondi present

17   evidence establishing that he relied on these statements.  When directly asked how he relied on the

18   alleged misrepresentations, Bondi stated only that his ability to obtain credit was impacted.  Ex. D at

19   14.  To establish a fraud claim, however, Bondi must show how *he* relied on a misrepresentation.

20   Bondi cannot make this showing, and BANA is entitled to summary judgment in its favor on this

21   claim.

22   …

23   …

24   …

25   …

26

24

AKERMAN LLP
1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

### c.  Letter Implying that Bondi Included False Information on His Loan Application.

Bondi also contends that BANA misrepresented that he provided false information on his loan application in a letter dated July 12, 2014.  *See* Ex. E.  This letter does not state that Bondi included false information on his loan application.  *See id*.  Instead, the letter merely states that Old Republic Insurance Company rescinded insurance coverage on the second loan on the basis that employment records did not reflect that Bondi was self-employed for two years at the time of the loan's funding.  *Id*.  Bondi does not, and cannot, contend that this statement is an inaccurate reflection of the reason Old Republic gave for rescinding insurance coverage on the loan because it is the reason Old Republic actually gave.  *See* Old Republic Letter, **Exhibit F**.  Further, like Bondi's other fraud claims, Bondi fails to establish how he relied on this statement.  Without evidence that Bondi reasonably relied on the statements in this letter to his detriment, the claims for fraud and misrepresentation fail, and summary judgment must be granted in BANA's favor.  *See Bulbman*, 825 P.2d at 592.

### d.  Credit Reporting on the Loan.

Lastly, to the extent Bondi bases this claim on BANA's credit reporting, it likewise fails.  In his deposition, Bondi clarified that this claim is based on Bank of America's alleged misrepresentation ***to Nationstar*** that the loan was active and collectible, and on an alleged misrepresentation ***to the credit reporting agencies*** that the loan was transferred.  Ex. C, at 37:22-39:12 (emphasis added).  Once again, however, Bondi does not contend that *he* relied on the credit reporting to his detriment.  Instead, he contends that BANA intended for Nationstar and the credit reporting agencies to rely on these misrepresentations.  As previously explained, Bondi cannot recover on a fraud or misrepresentation claim based on BANA's alleged desire for someone other than Bondi to rely on information.  BANA is entitled to summary judgment in its favor on this claim as well.

…

25

AKERMAN LLP
1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

**D.      BANA Is Entitled to Bondi's Civil Conspiracy Claim.**

Lastly, BANA is entitled to judgment in its favor on Bondi's civil conspiracy claim because Bondi cannot prove the existence of any illegal agreement between BANA and Nationstar.  Civil conspiracy is a way to hold other parties liable for an underlying tort; it is not a stand-alone claim. *Paul Steelman Ltd. v. HKS, Inc.*, No. 2:05-cv-01330-BES-RJJ, 2007 WL 295610, at *3 (D. Nev. Jan. 26, 2007) ("Civil conspiracy is not an independent cause of action-it must arise from some underlying wrong.").  To establish a claim for civil conspiracy, a plaintiff must establish: (1) the commission of an underlying tort; and (2) an agreement between the defendants to commit that tort. *GES, Inc. v. Corbitt*, 117 Nev. 265, 270-271, 21 P.3d 11, 15 (2001).  A plaintiff cannot succeed on a claim for civil conspiracy where his underlying claim is unsustainable.  *Grisham v. Philip Morris USA*, 403 F.3d 631, 635 (9th Cir. 2000).

**1.      Bondi Cannot Produce Evidence of an Illegal Agreement.**

"Actionable civil conspiracy arises where two or more persons undertake some concerted action with the intent 'to accomplish an unlawful objective for the purpose of harming another,' and damage results.  *Guilfoyle v. Olde Monmouth Stock Transfer Co., Inc.*, 130 Nev. Adv. Op. 78, 335 P.3d 190, 198-99 (2014) (quoting *Consol. Generator–Nevada, Inc. v. Cummins Engine Co.*, 114 Nev. 1304, 1311, 971 P.2d 1251, 1256 (1998)).  Accordingly, a plaintiff that wishes to recover for civil conspiracy must first provide evidence of an agreement between the defendants.  *Id*. "Summary judgment is appropriate if there is no evidence of an agreement or intent to harm the plaintiff." *Id*. (internal citations omitted).

Under this standard, Bondi's civil conspiracy claim fails.  First, Bondi has no evidence demonstrating an intent on the part of BANA or Nationstar to harm Bondi.  Second, Bondi has no evidence that Nationstar and BANA agreed to act "to accomplish an unlawful objection."  Without this evidence, Bondi has failed to establish his right to recover for civil conspiracy, and the Court must grant summary judgment in favor of BANA on this claim.

AKERMAN LLP
1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

### 2. Bondi Fails To Establish An Actionable Underlying Tort

Civil conspiracy requires the existence of an underlying tort, and is **not** a stand-alone claim. *Paul Steelman Ltd.*, 2007 WL 295610, at *3. Accordingly, Bondi cannot recover on a civil conspiracy claim without proving the existence of an actionable underlying tort. As explained above, the undisputed evidence shows that Bondi has not established any actionable tort. Consequently, he has failed to prove the existence of an actionable underlying tort on which the conspiracy claim could be premised. BANA is entitled to summary judgment in its favor on the conspiracy claim.

## V. CONCLUSION.

The undisputed facts show that no genuine issue of material fact exists as to Bondi's claims. Based on these facts, BANA is entitled to judgment in its favor as a matter of law. Accordingly, the Court should grant BANA's motion for summary judgment.

DATED this 13th day of April, 2016.

AKERMAN LLP

/s/ Allison R. Schmidt, Esq.
ARIEL E. STERN, ESQ.
Nevada Bar No. 8276
ALLISON R. SCHMIDT, ESQ.
Nevada Bar No. 10743
1160 Town Center Drive, Suite 330
Las Vegas, Nevada 89144

*Attorneys for Defendants Nationstar Mortgage, LLC, and Bank of America, N.A.*

AKERMAN LLP
1160 TOWN CENTER DRIVE, SUITE 330
LAS VEGAS, NEVADA 89144
TEL.: (702) 634-5000 – FAX: (702) 380-8572

1

### CERTIFICATE OF SERVICE

2      I HEREBY CERTIFY that on the 13th day of April, 2016 and pursuant to FRCP 5, I served

3   via CM/ECF a true and correct copy of the foregoing **BANK OF AMERICA, N.A.'S MOTION**

4   **FOR SUMMARY JUDGMENT** to:

5

6   Rebecca A. Fuller, Esq.
    FULLER LAW PRACTICE PC
    500 N. Rainbow Blvd., Suite 300
7   Las Vegas, NV 89107

8   *Attorney for Plaintiff*

9

10  Taylor A. Anello, Esq.
    DICKINSON WRIGHT PLLC
    8363 West Sunset Road, Suite 200
11  Las Vegas, NV 89113

12  Cynthia Alexander, Esq.
    SNELL & WILMER LLP
    3883 Howard Hughes Parkway, Suite 1100
13  Las Vegas, NV 89169

14

15  *Attorneys for Respondent Nevada Public Radio*

16

17

18

19                                      /s/ *Allen G. Stephens*
                                        An employee of AKERMAN LLP
20

21

22

23

24

25

26