# EXHIBIT

# C

# Michael Bondi

## Michael Bondi vs. Nationstar Mortgage, LLC

## March 9th, 2016



**Page 1**

1        UNITED STATES DISTRICT COURT

2           DISTRICT OF NEVADA

3   MICHAEL BONDI,              )
                               )
4            Plaintiff,         )
                               )
5        vs.                    )CASE NO.:
                               )2:14-cv-001215-LDG-GWF
6   NATIONSTAR MORTGAGE, LLC,   )
    a Delaware limited          )
7   liability company; BANK OF  )
    AMERICA, N.A., DOES I-X,    )
8   inclusive; and ROE          )
    CORPORATIONS I-X inclusive, )
9                               )
                               )
10           Defendants.        )
    _____)

11

12

13

14          DEPOSITION OF MICHAEL BONDI

15          WEDNESDAY, MARCH 9, 2016

16               10:36 A.M.

17      AT 10080 WEST ALTA DRIVE, SUITE 100

18               LAS VEGAS, NEVADA

19

20

21

22

23

24   REPORTED BY:  MICHELLE R. FERREYRA, CCR No. 876
                        NO. 305156

25

**Page 2**

1        DEPOSITION OF MICHAEL BONDI,

2    taken at 10080 West Alta Drive, Suite 100, Las Vegas,

3    Nevada, on WEDNESDAY, MARCH 9, 2016, at 10:36 a.m.,

4    before Michelle R. Ferreyra, Certified Court Reporter,

5    in and for the State of Nevada.

6    APPEARANCES:

7    For the Plaintiff:

8            FULLER LAW PRACTICE
             BY:  REBECCA A. FULLER, ESQ.
9            500 North Rainbow Boulevard
             Suite 300
10           Las Vegas, NV 89107
             (702) 533-3266
11           (702) 553-3267 Fax
             rfuller@fullerlawpractice.com
12

13   For Defendants:

14           AKERMAN LLP
             BY:  ALLISON R. SCHMIDT, ESQ.
15           1160 Town Center Drive
             Suite 330
16           Las Vegas, NV 89144
             (702) 634-5000
17           (702) 380-8572 Fax
             allison.schmidt@ackerman.com
18

19

20

21

22

23

24

25

**Page 3**

1                I N D E X

2   WITNESS:  MICHAEL BONDI

3   EXAMINATION                              PAGE

4   Examination By Ms. Schmidt                4

5

6

7            INDEX TO EXHIBITS

8       EXHIBIT                              PAGE

9   Exhibit A First mortgage Mr. Bondi took   11
             out on his property

10  Exhibit B Second mortgage Mr. Bondi took  12
             out on property

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 4**

1        LAS VEGAS, NEVADA, WEDNESDAY, MARCH 9, 2016;

2               10:36 A.M.

3               -oOo-

4       (In an off-the-record discussion held prior to the

5    commencement of the deposition proceedings, counsel

6    agreed to waive the court reporter requirements under

7    Rule 30(b)(4) of the Nevada Rules of Civil Procedure.)

8    Whereupon,

9

10           MICHAEL BONDI,

11   having been first duly sworn to testify to the truth,

12   the whole truth and nothing but the truth, was examined

13   and testified as follows:

14

15               EXAMINATION

16   BY MS. SCHMIDT:

17       Q.   Good morning.  Can you state and spell your

18   last name for the record?

19       A.   Michael Bondi, B-o-n-d-i.

20       Q.   And, Mr. Bondi, my name is Allison Schmidt.  I

21   am an attorney for Bank of America and Nationstar

22   Mortgage, LLC, in the action that you filed against us

23   in federal court.  Do you understand that?

24       A.   Yes.

25           MS. SCHMIDT:  And I'm going to have your

Michael Bondi

5

1      attorney also make her appearance for the record.
2          MS. FULLER:  Rebecca Fuller, Bar No. 9809.
3      BY MS. SCHMIDT:
4          Q.   Mr. Bondi, have you been deposed before?
5          A.   Yes.
6          Q.   Approximately how many times?
7          A.   For civil case, at least once.  And as a
8      former police officer, I have given testimony in
9      criminal cases.
10         Q.   In the civil case where you have been deposed
11     before, what was that case -- what was the subject
12     matter of that case?
13         A.   That was the -- a suit that I had brought
14     against AAA back in 2007, I believe.  I think I was
15     deposed in 2009 or 2010.
16         Q.   Was that in Nevada?
17         A.   Yes.
18         Q.   Okay.  Well, since you haven't been deposed in
19     a couple of years, I'm going to go over a couple of, I
20     guess, sort of ground rules that we have for these
21     things.  First of all, the oath that you just took is
22     the same oath that you'd take in a court of law and
23     carries with it the same penalties of perjury.  Do you
24     understand that?
25         A.   Yes.

6

1          Q.   And the court reporter is here to take down
2      everything that everybody says.  So if you let me
3      finish my questions before you start answering, I will
4      let you finish your answers before I start another
5      question, and then we will have a very clear record.
6      Do you understand that?
7          A.   Yes.
8          Q.   Also, the court reporter can't take head
9      shakes or gestures, so it's important that you answer
10     audibly.  Do you understand that?
11         A.   Yes.
12         Q.   From time to time, your attorney might object
13     to some of my questions for any number of reasons.
14     What we'll do is we'll let her finish her objections.
15     And then unless she instructs you not to answer, you go
16     ahead and answer the question.  Do you understand that?
17         A.   Yes.
18         Q.   I'm entitled to your best estimates, but not
19     guesses.  You understand the difference between a guess
20     and an estimate?
21         A.   Yes.
22         Q.   For instance, you could estimate the length of
23     this table, but you couldn't tell me the length of my
24     desk in my office because you have never been there;
25     correct?

7

1          A.   Yes.
2          Q.   If at any time you need to take a break, you
3      can just let us know.  What we'll do is we'll make sure
4      that any question that I have pending, that you answer
5      before we go on break.  But if you need a break, just
6      let us know.  Do you understand that?
7          A.   Yes.
8          Q.   All right.  Are you under the influence of any
9      drugs or alcohol that might affect your ability to
10     testify today?
11         A.   No.
12         Q.   Any medication that might affect your ability
13     to testify today?
14         A.   No.
15         Q.   And is there any other reason why you might
16     not be able to testify completely and truthfully today?
17         A.   Nope.
18         Q.   Okay.  We're going to start with just a little
19     bit of background about yourself before we get into
20     some of the stuff about your lawsuit.  Can you describe
21     your education for me?
22         A.   I graduated high school in West Los Angeles,
23     California in 1992.  I proceeded to obtain 64 college
24     units towards an A.S. degree at Los Angeles Valley
25     College and Administration of Justice.

8

1          Q.   And can you tell me approximately when it was
2      that you last attended college?
3          A.   2002.
4          Q.   And can you tell me what your current
5      occupation is?
6          A.   I'm a realtor.
7          Q.   And approximately how long have you been a
8      realtor?
9          A.   This will be my 12th year.
10         Q.   Prior to becoming a realtor, what was your
11     occupation?
12         A.   I was a police officer.
13         Q.   Were you a police officer in Nevada?
14         A.   No.
15         Q.   Were you a police officer in California?
16         A.   Yes.
17         Q.   With respect to your occupation as a realtor,
18     do you have any certifications or training or ongoing
19     education that you do with respect to that?
20         A.   Yes.  I have numerous designations.  The first
21     one was just earned in June of 2015.  It's a CRS
22     designation, which stands for Certified Residential
23     Specialist.  Only the top three percent of all realtors
24     in -- in any realtor capacity earn that designation.
25             I'm also an accredited buyer's representative,

9

1  which is ABR.  I earned that back in -- I believe

2  '06 or '07.  I'm not 100 percent sure on the date.

3     Also, I'm certified as an E-Pro, which is

4  Electronic Internet Technology Specialist in regards to

5  real estate.  I have also been certified in short sales

6  and foreclosures by the National Association of

7  Realtors, which is an SFR designation, which was earned

8  in -- I believe 2009 or 2010.  And then I -- I take two

9  years -- every two years, I take 24 continuing

10 educational units to renew my license.

11    Q.  With respect to your training and

12 designations, does that include education with respect

13 to mortgage lending?

14    A.  There's some aspects of it with the short

15 sales and foreclosure training.  It relates to the

16 short sale or foreclosure process, so I would assume

17 that would be part of mortgage lending.

18    Q.  Okay.  Can you describe some of the specifics

19 of your training with respect to short sales and

20 foreclosure processes?

21    A.  A lot of it was more or less on-the-job

22 training.  I have also been mentored by other short

23 sale experts before I started doing them.  A lot of it

24 was also just interaction with bank employees, loss

25 mitigators, customer service reps, things like that.

10

1     Q.  Is the training with respect to foreclosures

2  the resale of foreclosures or --

3     A.  Some of it was -- I would say on-the-job

4  training, as far as understanding the foreclosure

5  process or the resale process.  When I have dealt with

6  buyers -- let's say a buyer's purchased a foreclosed

7  property, so, yes, I have dealt with that before.

8     Q.  Okay.  And so the property that you're the

9  former owner of, that was 9332 Golden Grape Court; is

10 that correct?

11    A.  Yes.

12    Q.  So when I refer to the property in this

13 deposition, I'm referring to that.  Do you understand

14 that?

15    A.  Yes.

16    Q.  Okay.  Perfect.  So you purchased the property

17 in August of 2006; is that correct?

18    A.  I think I was under contract in August, but I

19 think we closed in September.

20    Q.  Okay.

21    A.  So I'll just estimate that.  I don't remember

22 the exact date.

23    Q.  And that's fine.  I understand a lot of this

24 is -- well, now going on ten years ago --

25    A.  Yeah.

11

1     Q.  -- so we won't hold you --

2     A.  Okay.

3     Q.  -- you know, to any exact date.

4     A.  Specific -- 100 percentage, I don't know.

5     Q.  Do you recall the approximate purchase price?

6     A.  I'm going to estimate at -- I believe it was

7  $363,000.

8     Q.  And to finance the purchase of the property,

9  you took out two loans; is that correct?

10    A.  Yes.

11    Q.  And there was a first deed of trust -- I'm

12 going to hand you what we'll mark as Exhibit A.

13        (Exhibit A marked.)

14 BY MS. SCHMIDT:

15    Q.  And if you would just take a minute and sort

16 of page through it a little bit.

17        And on what's marked at the bottom of page 13

18 of 14, does that appear to be your signature?

19    A.  Yes.

20    Q.  And do you have any reason to believe that

21 this isn't the first mortgage that you took out on your

22 property?

23    A.  No, I do not.

24    Q.  Okay.  All the terms in the first couple of

25 pages and everything appear to be what you recall

12

1  agreeing to?

2     A.  Yes.

3     Q.  Okay.

4         (Exhibit B marked.)

5  BY MS. SCHMIDT:

6     Q.  I am going to hand you what we will mark as

7  Exhibit B.  And sort of the same thing with this one,

8  if you could, just look at it, glance it over.  On

9  what's marked as page 6 of 7, does that appear to be

10 your signature there?

11    A.  Yes.

12    Q.  And does this appear to be the second mortgage

13 that you took out on the property?

14    A.  Yes.

15    Q.  Can you describe why you decided to take out a

16 first and second mortgage as opposed to any other type

17 of financing?

18    A.  I really don't remember.  I believe that at

19 that time, that was the specific loan program that the

20 loan officer had suggested to me.

21    Q.  And did you have a relationship with the loan

22 officer that you were using through your occupation?

23    A.  Yes.  At that time, her name was Susan Deute.

24 And I think she did a couple of loans for other buyers

25 of mine.

Michael Bondi

13

1    Q.   And in the lawsuit that you filed against
2    Bank of America and Nationstar, is it really -- is it
3    the first loan -- first deed of trust that's at issue,
4    or issues with the second that are at issue in your
5    lawsuit?
6    A.   It's the second.
7    Q.   Do you recall when you stopped making payments
8    on your loan?
9    A.   I would estimate February of 2008, I believe.
10   February or March.  Somewhere around there.  I'm not
11   100 percent sure.
12   Q.   And can you just briefly describe the
13   circumstances that led up to that?  I believe that
14   there had been mention of a car accident that you were
15   in?
16   A.   Yes, that's correct.  On or about November 14,
17   2006, I was stopped at a stoplight right here at
18   Charleston and Apple Lane, and a vehicle failed to stop
19   and rear-ended me, launching me into the intersection.
20   Q.   And did the car accident leave you unable to
21   work for some period of time?
22   A.   Yes.
23   Q.   Do you know approximately when you returned to
24   work following the injuries sustained in the car
25   accident?

14

1    A.   It was sporadic through '07 and '08.  I would
2    say more or less towards the summer of '08 I really
3    started going back to full-time work, because I had to
4    endure two surgeries and a lot of medical treatment for
5    the year of '07.
6    Q.   And so the property, the 9332 Golden Grape,
7    was foreclosed on in June of 2009; is that correct?
8    A.   Yes.
9    Q.   Did you contest anything having to do with the
10   foreclosure?
11   A.   The actual legal process of the foreclosure or
12   during the time of the foreclosure?  I'm just trying to
13   understand your question a little bit better.
14   Q.   Okay.  Well, yes.  Let's ask it as two
15   separate questions.  It's probably better that way.
16        During the foreclosure process, did you
17   contest any of the foreclosure process or try to do
18   anything to stop the foreclosure?
19   A.   Yes.  I received numerous short sale offers on
20   the property.  I listed the property for almost two
21   years, and I -- I at least found -- I think at least
22   six offers that I submitted to you under discovery.
23   And I believe there were actually more, but I just
24   couldn't find them.
25   Q.   And so following the foreclosure sale, did you

15

1    dispute anything having to do with the foreclosure
2    process afterwards?
3    A.   No.  Not the legal foreclosure process, no.
4    Q.   You indicate that Bank of America, following
5    the foreclosure, agreed to forgive the amount owed on
6    your second loan; is that correct?
7    A.   Yes.
8    Q.   Do you know approximately when that agreement
9    was entered into?
10   A.   I started talking to Bank of America, I
11   believe, in April of 2010, and I think the re -- the
12   final resolution was sometime in November of 2010.
13   Q.   And the agreement where Bank of America agreed
14   to forgive the amount on the second, was that in
15   writing?
16   A.   Yes, it was.
17   Q.   And have you produced a copy of that to your
18   attorney?
19   A.   .I produced what I believe were several secure
20   Bank of America e-mails that I no longer have access
21   to.  But nothing specifically other than credit reports
22   that indicate that I did have a zero balance.
23   Q.   So the agreement to forgive was contained in a
24   secured e-mail?
25   A.   Yes.

16

1    Q.   And did Bank of America ask for you to give
2    them anything or make any promises to them in exchange
3    for their agreement to forgive the balance?
4    A.   Some of the representatives that I had talked
5    to -- I had basically started talking to them about,
6    you know, suing them for the irregular credit reporting
7    that they were doing and the discovery of the creditors
8    insurance, things like that.  And they had basically
9    had said, Well, if you're not going to sue us, we'll
10   update your credit report and we'll fix it, and we'll
11   investigate it.  And I said, Okay.  Fine.  And during
12   that six or seven-month process between April and
13   November of 2010, I just thought everything was being
14   worked out.  And then when I started seeing my credit
15   reports being reported as zero balance, I took that
16   that everything was being agreed to.
17   Q.   And in the secured e-mails, did a Bank of
18   America representative specifically say that they would
19   waive their right to collect on the second?
20   A.   More or less, yes.  I had looked at some of
21   the letters and e-mails, and I interpret those as full
22   release letters, yes.  Especially over the amount of
23   times and especially with the actions that subsequently
24   resulted in almost four years of zero balance credit
25   reporting, so yes.  I definitely believe that.

17

1    Q.    Did Bank of America ask you to sign a written
2  agreement that you wouldn't sue them if they didn't
3  seek collection on the second?
4    A.    No, I don't believe so.
5    Q.    And I think in one of your answers you had
6  mentioned that you had discovered -- there was
7  discovery of creditor's insurance; is that correct?
8    A.    Yes.
9    Q.    What do you mean by that?
10    A.    Upon going through the investigation process
11  of my own short sale, why I was denied, it was revealed
12  to me by one of -- I don't know if it was a Countrywide
13  employee or if it was a Bank of America employee, but I
14  think it was sometime right around the merger.  One of
15  the Bank of America employees I was working with, he
16  had mentioned the problems with the short sales were
17  because there was additional creditor's insurance added
18  onto my file, and they were requesting a promissory
19  note to be signed to okay the short sale.  So he
20  started telling me that it was through Old Republic
21  Insurance, and that's when I started investigating and
22  finding out why this thing called creditor's insurance
23  was applied after we had closed on my loan back in
24  August or September '06.
25    Q.    And do you believe that Bank of America or

18

1  Nationstar received payment from Old Republic on either
2  of your mortgages?
3    A.    Yes, I do.
4    Q.    And what's the basis for that belief?
5    A.    When I had contacted Carol Burns at
6  Old Republic Insurance, she advised me that there was a
7  payout on the first, and that there was also a claim
8  against the second.  But she had no information on
9  that.
10    Q.    Did you ever receive correspondence from
11  Bank of America or Nationstar indicating that a
12  mortgage insurance claim was denied?
13    A.    No.
14    Q.    Have you ever seen any correspondence from
15  Bank of America or Nationstar indicating that they had
16  made a mortgage insurance claim and that claim had been
17  denied?
18    A.    No, not that I believe so.  Or do you know
19  what?  I think -- I think there was an actual
20  letter -- before we actually filed this lawsuit, I
21  think there was just showing a payment history.  I
22  don't think there was anything about insurance claims.
23  I don't remember if there was or not.
24    Q.    In some of your social media, you claim that
25  you've won two previous lawsuits against Bank of

19

1  America; is that correct?
2    A.    I have never said that.
3    Q.    Have you ever been involved in any lawsuits
4  against Bank of America prior to this one?
5    A.    No.
6    Q.    With respect to the credit reporting, when did
7  you believe that Bank of America first reported
8  incorrectly, approximately?
9    A.    July of '09, right after the foreclosure.
10    Q.    What was the inaccurate reporting in July of
11  2009?
12    A.    It kept showing me as missing monthly payments
13  rather than it being a foreclosed property.  So it kept
14  showing as an open foreclosure, but missing the
15  payments consecutively for -- I would say at least a
16  year after the foreclosure, and that's what started the
17  conversations in April of 2010.  So I would say from
18  July of '09 to April of 2010, if not longer, those
19  reports were inaccurate.
20    Q.    And was that reporting on the first or the
21  second or both?
22    A.    Both.
23    Q.    And when was that resolved, with at least
24  Bank of America?
25    A.    I believe like November of 2010 with a

20

1  reporting of December 2010.
2    Q.    And has Bank of America done any incorrect
3  reporting following that time period that you are aware
4  of?
5    A.    Following which time frame?
6    Q.    Following the resolution in November,
7  December of 2010?
8    A.    Yes.  I would say -- I would estimate
9  probably, what, in August of 2013 they started
10  reporting it as -- instead of it a closed zero balance,
11  it was now transferred to another servicer.
12    Q.    And was that Bank of America that was
13  reporting in 2013 or Nationstar?
14    A.    Well, both of them at one point were actually
15  reporting me.  So it actually looked like I had three
16  open real estate accounts at the same time.
17    Q.    Okay.  Were you able to resolve the issues in
18  2013 with Bank of America?
19    A.    No.
20    Q.    And you had indicated that following the
21  foreclosure, both loans were showing as missing monthly
22  payments; is that correct?
23    A.    Yes.
24    Q.    And that continued for approximately one year
25  following the foreclosure; is that correct?

---

**21**

1    A.   Almost a year, yeah.

2    Q.   Okay.

3    A.   I would estimate -- well, at least July of

4  '09 to probably -- do you know what?  Probably -- yeah.

5  From at least July of '09 to November, December 2010.

6    Q.   Okay.  Did you believe that you didn't owe any

7  monthly payments on the second loan following the

8  foreclosure?

9    A.   Yes.

10   Q.   And what was your basis for that belief?

11   A.   From what was agreed upon with Bank of

12  America.

13   Q.   And that was the agreement in -- after the

14  negotiations from April 2010 to November 2010?

15   A.   Yes.  And then subsequent reporting of zero

16  balances on both accounts.

17   Q.   I'm going to go through a couple of things

18  that are in your complaint against Bank of America and

19  Nationstar.  So I have a copy --

20   A.   Okay.

21   Q.   -- for you and your attorney, just sort

22  of -- and I will just try do go through them

23  sequentially.

24   A.   Okay.

25   Q.   Turning on page 2, I'm looking at the

---

**22**

1  paragraph numbered -- paragraph 10, where it says:  On

2  or about June 4, 2009, a property located at

3  9332 Golden Grape Court, Las Vegas, Nevada 89148, owned

4  by Bondi and secured by first and second mortgage loans

5  from Countrywide, which later became Bank of America,

6  was foreclosed upon.  In looking at the deeds of trusts

7  that we've marked as Exhibit A and B, it appears the

8  lender was CCFF, LLC, doing business as Greystone

9  Financial Group.  Is it -- with the information about

10  who you obtained your loan from in paragraph 10 be

11  inaccurate?

12   A.   I'm not sure how you want me to answer that

13  question.  Because Greystone is the actual loan

14  company, and my belief is that Greystone sold that loan

15  to Countrywide for it to be serviced by Countrywide.

16  So if you are asking -- I don't know if you want to

17  rephrase that question.  But my belief is Greystone is

18  who I went to to go get the loan, and then they

19  subsequently sold it off to Countrywide to be serviced

20  by Countrywide.

21   Q.   Okay.  And what's your basis for the belief

22  that the loans were sold to Countrywide?

23   A.   I believe in my loan docs it actually

24  says -- there's an actual cause -- clause in there that

25  they would actually -- more than likely sell off the

---

**23**

1  loan or have it be serviced by a third party.

2    Q.   Going on to the next page, looking at

3  paragraph 16 where it says:  On approximately June 4,

4  2014, Bondi received a letter from Bank of America

5  stating that the second mortgage account -- the account

6  was being sold and transferred to Nationstar and that

7  Bondi owed approximately $69,000 to Nationstar.

8        Do you see where it says that?

9    A.   Yes, I do.

10   Q.   Okay.  And is that when you believed that

11  Nationstar was going to try to collect on this account?

12   A.   Yes.

13   Q.   And what did you do in response to receiving

14  that letter?

15   A.   I had contacted Bank of America's Office of

16  the President, CEO in North -- North Carolina.

17   Q.   And what was the outcome of your

18  communications with the Office of the CEO?

19   A.   At first they said they would start looking

20  into my situation on one of the recorded phone calls

21  that I had with Dorie Galfmaker.  She admitted three

22  times during the conversation that I did, in fact, have

23  a zero balance and that they were also at the same time

24  trying to collect mortgage insurance from Old Republic.

25  And so at that point, I had asked her then, If you're

---

**24**

1  trying to collect the insurance and I have a zero

2  balance, then how do I owe you $70,000, and why are you

3  selling it to Nationstar?

4    Q.   Okay.  And then in the very next paragraph,

5  No. 17, it talks about a letter you had sent to

6  Nationstar in July of 2013.  Did you send that letter

7  because you believe Nationstar was going to try to

8  collect on the account that you believe had a zero

9  balance?

10       MS. FULLER:  Just to clarify, it doesn't

11  mention a letter in that paragraph.

12       MS. SCHMIDT:  Oh, I apologize.  Well, let me

13  clarify that.  Thanks.

14  BY MS. SCHMIDT:

15   Q.   How did you contact Nationstar in July of

16  2013?

17   A.   First I contacted their customer service line,

18  then I researched on the Internet.  They also have a

19  CEO and president of Nationstar.  I contacted that -- I

20  believe her name was Sarah.  They don't give your

21  last -- they don't give their last name.  I spoke with

22  Sarah a couple of times.  The problem that I had with

23  all of this is during this time, not all of Bank of

24  America's records were transferred to Nationstar.  So

25  Nationstar didn't even know who I was for like a month,

---

Michael Bondi

**25**

1  month and a half. So there were letters sent to them
2  with copies of my credit reports. There are also
3  numerous phone calls to customer service and to other
4  Nationstar reps as well, too.
5      Q.  So in July of 2013 you were contacting
6  Nationstar both by phone and also writing letters?
7      A.  Yes.
8      Q.  Okay. And going on to the next page, in
9  paragraph 22 it talks about Nationstar reporting to all
10  three Consumer Reporting Agencies that the account was
11  a charge-off with a balance owed of approximately
12  $69,371. Do you see where it says that?
13      A.  Yes, I do.
14      Q.  Why do you believe that characterizing the
15  account as a charge-off was inaccurate?
16      A.  Because it was inaccurate.
17      Q.  What about that is inaccurate, specifically?
18      A.  It was being reported for almost four years as
19  a zero balance, and then all of a sudden when this
20  thing was sold, it now became a charge-off. And
21  according to my understanding of looking up, as far as
22  how a charge-off works, if this was going to be a
23  charge-off, it should have been charged off the first
24  year of when supposedly it went into a bad debt status,
25  not almost five years later.

**26**

1      Q.  And what did you research to determine that
2  you believed the charge-off was the incorrect
3  terminology?
4      MS. FULLER:  I'm just going to object on the
5  basis that he doesn't have specific legal knowledge.
6      But you can go ahead and answer the question.
7      It's calling for a legal conclusion.
8      THE WITNESS:  I looked over some decisions
9  from the IRS, specifically from Craig Whojay
10  (phonetic), who is the Internal Revenue general
11  counsel, who discussed how charge-offs and how
12  subsequent reporting or collecting of charge-off debt
13  is to be handled. And as far as, in my mind, with the
14  negotiation that was done in 2010 and subsequent
15  reporting, zero balance meant a zero balance to me.
16  BY MS. SCHMIDT:
17      Q.  Okay. Did you ever repay the loan in full?
18      A.  No, I did not.
19      Q.  Okay. In paragraph 24 on that same page, it
20  talks about mortgage loan through All Western Mortgage
21  that was declined after previously qualifying. Do you
22  see where it says that?
23      A.  Yes.
24      Q.  What were you obtaining that loan for?
25      A.  Trying to get out of a two-story into a single

**27**

1  story because I have pretty bad knees going up and down
2  the stairs. It has been pretty painful. So at that
3  time I was trying to shop around and try to get into a
4  single-story home.
5      Q.  So you were -- it was to purchase a home?
6      A.  Yes.
7      Q.  Okay. And did you produce evidence of your
8  loan qualification to your attorney?
9      A.  Yes, I believe we -- I did.
10      Q.  Okay. In the property that you live -- the
11  two-story property where that you lived at the time,
12  was that a rental property?
13      A.  No.
14      Q.  Did you own that property?
15      A.  No. My wife does.
16      Q.  When you were declined for the All Western
17  Mortgage loan, was it stated that it was specifically
18  due to credit reporting on that second mortgage?
19      A.  The letter I received in the subsequent credit
20  report was because -- yes, of the charge-off.
21      Q.  Do you recall approximately when you were
22  attempting to qualify for that loan and purchase the
23  house?
24      A.  I believe in the beginning of 2013.
25      Q.  And was there a specific property that you

**28**

1  were going to buy or were you just kind of shopping
2  around at that time?
3      A.  I was shopping around because the inventory
4  was so low that, you know, when one popped up, I wanted
5  to get everything lined up so that if I needed to act
6  on it, I could write up a contract immediately on it.
7      Q.  Okay.
8      A.  So that was the whole reason of having the
9  pre-approval and having that completed.
10      Q.  Understood. Okay. So I am going to move on
11  to page 5.
12      A.  (Witness complies.)
13      Q.  In paragraph 29, you indicate that the
14  defendants violated 15 USC 1692(e)2 by representing the
15  debt was owed by plaintiff after confirming that
16  plaintiff had a zero balance. Can you describe to me
17  when those representations were made?
18      A.  Sure. The recorded phone call that
19  Bank of America recorded, and I had recorded, with the
20  office of the president with Dorie Galfmaker. I
21  believe that was July 13, 2013, where she admits at
22  least three times, to my knowledge, that I had a zero
23  balance. And then also the subsequent of almost four
24  years of zero balance credit reporting.
25      Q.  And I'm going to go -- and I apologize if this

---

29

1 is repetitive, but I am going to go through some of
2 these questions, first for Bank of America, and then
3 for Nationstar --
4      A.   Okay.
5      Q.   -- just so that I have a clear understanding.
6 Who did Bank of America represent that you owed a debt
7 to?  Or who was that representation made to?
8           MS. FULLER:  Can you restate that question?
9           THE WITNESS:  Yeah, I don't -- I don't --
10 yeah, I don't understand it.
11 BY MS. SCHMIDT:
12      Q.   Okay.  Yes.  It says that the defendants -- so
13 Bank of America violated this statute by representing
14 that a debt was owed by plaintiff.  I'm trying to
15 determine who Bank of America made that representation
16 to.
17      A.   They made it to Nationstar for collection
18 purposes.
19      Q.   And now with respect to Nationstar
20 representing that you owed a debt after confirming the
21 zero balance, who did Nationstar make that
22 representation to?
23      A.   To all of my creditors, to all Western
24 Mortgage.  All that now became pretty much public
25 knowledge at that point.

---

30

1      Q.   Okay.  Do you know, is there presently, as we
2 sit here today, an issue with your credit reporting?
3      A.   No.
4      Q.   Can you estimate for me when all the credit
5 reporting issues were resolved?
6      A.   They started being resolved in December of
7 2014, and I believe January, February of 2015.
8      Q.   In paragraph 32, it indicates that defendant,
9 Bank of America, implied that you made fraudulent
10 representations on your original loan application.
11 When was that -- or how did they imply that?
12      A.   There was a letter by Leah Pordean (phonetic)
13 or something like that -- you have a copy of it in
14 discovery.  And the insinuation was that I wasn't a
15 licensed realtor two years prior to the inception of
16 the loan, and that that was basically a false statement
17 on the loan application.  I think that's what
18 she -- she also stated that because of that statement,
19 that apparently there was some kind of denial of
20 insurance or something like that.
21      Q.   And do you know who that individual made that
22 representation to?
23      A.   The letter was just addressed to me.
24      Q.   And when you received that letter, did you
25 believe you had made fraudulent representations on your

---

31

1 loan application?
2      A.   No.
3      Q.   And so you knew that any implication that you
4 had made the fraudulent misrepresentation -- or a
5 fraudulent representation on your loan application was
6 not true?
7      A.   I never made any false statements on a loan
8 application.
9      Q.   Okay.  In paragraph 34, it indicates that you
10 have suffered actual damages in the amount of excess of
11 $1 million.  What type of damages do you have in excess
12 of $1 million?
13      A.   Depending on punitive damages and damages that
14 would be assessed by the court or a jury, the initial
15 damages that I calculated as of -- what was it, January
16 of 2016, I believe I was almost at $400,000 in damages.
17 So looking at that and depending on what punitive
18 damages would be or any violations of the United State
19 Code that was mentioned above, depends on those
20 violations as well, too.  Specifically, to every time
21 that Bank of America reported my credit, those
22 violations would have added up as well, including
23 additional penalties and damages as well.
24      Q.   In paragraph 33, you indicate that, The
25 defendants are motivated by enhanced profits.  Do you

---

32

1 see where it says that?
2      A.   Yes.
3      Q.   Can you describe your basis for that belief?
4           MS. FULLER:  Objection.  Calls for a legal
5 conclusion.
6           THE WITNESS:  Well, in dealing with short
7 sales, you know, they've had numerous opportunities to
8 settle the mortgage crisis from 2008 that we
9 experienced out here, and they decided to foreclose on
10 people rather than do the right thing and actually take
11 fair market value for properties.  That happened to me
12 over 250 times in dealing with short sale cases.  So I
13 would say, yeah.  They were absolutely motivated by
14 financial gain or enhanced profits.
15 BY MS. SCHMIDT:
16      Q.   Do you believe that Bank of America profited
17 from their dealings with you?
18      A.   Absolutely.
19      Q.   How do you believe they profited?
20      A.   They received numerous bailouts from my tax
21 dollars.  They received money from TARP, they were
22 given money from HAMP and HARP, they were also given
23 money from the new buyer.  And there was also still
24 that nobody has proven to me that there was some type
25 of insurance on my loans, and they either attempted to

---

Michael Bondi

33

1  collect and received money on the first from what I was
2  told.  So I still have not received any information
3  from Bank of America stating that they have taken a
4  loss on my property.
5      Q.  Have you requested information from
6  Bank of America that they have taken a loss?
7      A.  Numerous times.  As a matter of fact, I
8  believe I even said that in recorded conversations with
9  Dorie Galfmaker, that how in the world are you able to
10  collect twice on the same debt, when she was admitting
11  to me that I had a zero balance, and that they were
12  collecting insurance at the same time, and selling off
13  the supposed $70,000 debt to Nationstar?  So you are
14  basically collecting twice on the same zero balance?
15  So, yes, I definitely believe that they were getting
16  enhanced profits off of that.
17      Q.  Do you believe that Nationstar profited from
18  their dealings with you?
19      A.  That I don't know.  I don't have enough
20  information to make a conclusion on that.  If they
21  charged off and the charge-off -- they could have
22  possibly gotten tax benefits off of the -- off of the
23  charge-off.
24      Q.  Okay.  Turning on to page 6 of your complaint,
25  in paragraph 39 it says:  Defendants failed to review

34

1  all relevant information provided by the Consumer
2  Reporting Agencies.
3      Why do you believe that the defendants didn't
4  review all the relevant information?
5      A.  Well, if they did, they wouldn't have reported
6  me negatively, number one.  Number two, they wouldn't
7  have sold off a zero balance account to Nationstar
8  claiming that I owe $70,000.  I mean, that
9  subsequent -- subsequently it wouldn't have reported me
10  duplicate times on my credit report.
11      Q.  And then in paragraph 40 it says:  Defendants
12  failed to adequately conduct an investigation with
13  respect to the disputed information.  Why do you
14  believe the defendants didn't adequately conduct an
15  investigation?
16      A.  Several points.  Nationstar had submitted
17  several letters to my attorney and myself, and to
18  Senator Harry Reid's office, stating that they were
19  never going to report me, that I did, in fact, have a
20  zero balance.  They weren't going to seek any further
21  collection or they were not going to report me
22  negatively on my credit.  And then a couple of months
23  later, they did, despite all of that in writing.  So if
24  you are obviously invest -- conducting an investigation
25  based on facts and evidence that's presented to you,

35

1  that you clearly show you have a zero balance, and then
2  you do the reverse of that, then obviously they didn't
3  keep their word.  And they also failed to investigate
4  the information that they were given.
5      Q.  And you indicated that the credit reporting
6  disputes that you had began to be resolved in December
7  of 2014; is that correct?
8      A.  Yes.  For the Nationstar reporting, yes.
9      Q.  Okay.  So eventually, with respect to
10  Nationstar, the credit reporting issue was corrected?
11      A.  Yes.  After we filed our lawsuit.
12      Q.  And with respect to the credit reporting by
13  Bank of America, has that been corrected?
14      A.  Yes.  They both -- after the lawsuit was
15  filed, both Bank of America and Nationstar actually
16  deleted all three of the trade lines.  They don't show
17  up on my credit report anymore.
18      Q.  Turning to page 7 in paragraph 49, you
19  indicate that, Defendants provided false information to
20  the Consumer Reporting Agencies in or about April 2014.
21  Which of the defendants provided the false information
22  in April of 2014?
23      A.  Nationstar did when they reported the
24  charge-off as a major derogatory.
25      Q.  Did Nationstar make any false statements to

36

1  you with respect to your loan?
2      A.  Absolutely.
3      Q.  And what are those false statements?
4      A.  Well, I think we have got at least six or
5  seven letters stating that I did, in fact, have a zero
6  balance, that they were not going to report me in the
7  future, nor were they ever going to attempt to collect
8  anything off of me.  And those statements became false
9  the day in April of 2014, when they actually reported
10  to the credit bureaus that I was a major delinquent and
11  a charge-off, and that I owed $69,371.
12      Q.  Did you know that the statements were false
13  that Nationstar had made to you?
14      A.  Yes.
15      Q.  Did Bank of America make any false statements
16  to you with respect to the second loan?
17      A.  Well, I mean, the false -- the false
18  statements would be towards Nationstar stating that
19  there's an outstanding debt.  As far as a false
20  statement to me, no.  I mean, they actually admitted
21  that I did have a zero balance.
22      Q.  And then the -- turning to the next page, page
23  8.  Under -- it says, the fourth cause of action for
24  misrepresentation.  Paragraph 57, again, states that:
25  Defendants provided false information to the Consumer

Michael Bondi

37

1   Reporting Agencies on or about April 2014.

2       So is your claim related to the false

3   information that both Bank of America and Nationstar

4   provided to the credit reporting agencies?

5       A.   Well, there were -- there were subsequent

6   investigations after April 2014, which we turned over

7   to you in discovery where one of the three credit

8   bureaus -- I don't remember if it was Experian or

9   Equifax or TransUnion -- sent a letter in response

10  stating that Nationstar verified to us that the

11  information they provided is true and correct.  And

12  then a couple of months later, they reversed that

13  position, and that's when they started to send me

14  letters, zero balance letters from Nationstar.

15      Q.   So the misrepresentations that Nationstar was

16  making was to the credit reporting agencies?

17      A.   Yes.  That and those misrepresentations also

18  impacted me on all of my existing credit.  Because

19  that's when all my credit was basically destroyed or

20  dropped.  So like if I had a $10,000 credit line, it

21  went down to $4,000 or whatever the balance was.

22      Q.   And Bank of America was making

23  misrepresentations to the credit reporting agencies and

24  Nationstar; is that correct?

25      A.   The only time that Bank of America, that I can

38

1   recall, because I don't have any information in front

2   of me -- is when they started reporting it as a

3   transferred to -- I don't remember the exact

4   terminology.  But I believe it was transferred for

5   collections and that was it.  So it went from having a

6   zero balance closed account, previously past due open

7   balance, everything zero -- zero history for four years

8   to now being labeled -- I don't know.  Like in May or

9   June -- I don't remember the exact date.  But then it

10  started showing that it was actually transferred for

11  collection purposes.  So I don't know if that was

12  necessarily derogatory or anything else, but Nationstar

13  is the bulk of the negative reporting --

14      Q.   Did --

15      A.   -- in that timeframe.

16      Q.   Did Bank of America make any false statements

17  or misrepresentations to you?

18      A.   At what point?

19      Q.   Well, I'm trying to understand the basis of

20  your misrepresentation cause of action.  So I'm trying

21  to determine what these misrepresentations were and who

22  they were made to.  So I think you indicated that

23  Bank of America's misrepresentation was that the loan

24  was active and could be transferred for collection; is

25  that correct?

39

1       A.   At some point, yes.  They -- they changed it

2   from a closed zero balance, zero past due account to

3   now it being -- whether the terminology is active, I

4   don't know what they're going to say it is.  But at

5   some point, they sold off that loan to Nationstar and

6   said, Hey, this guy owes $69,371.  Go ahead and collect

7   off of him.  So, yeah, at some point I would think that

8   would be a misrepresentation.

9       Q.   Okay.  So they made -- Bank of America made a

10  false representation to Nationstar that this money was

11  owed and could be collected on?

12      A.   Yes.

13      Q.   Okay.  And then Nationstar for -- moving on to

14  them.  Their misrepresentations were to the credit

15  reporting agencies, that this is an active debt or a

16  charge-off?

17      A.   Yes.  I don't necessarily know if it was an

18  active debt, but they did charge it off --

19      Q.   Okay.

20      A.   -- and reported it as such -- as an -- as a

21  charge-off of $69,000.

22      Q.   So Nationstar misrepresentation was that this

23  was a charge-off when you believe it was not?

24      A.   Yes.  Because Nationstar sent me letters

25  starting in September of 2013 clearly stating, Hey, we

40

1   conducted an investigation, you are correct, you do

2   have a zero balance.  We will not report you now or in

3   the future to any credit bureaus or credit reporting

4   agencies that you owe money.  And I took that for face

5   value.  And that was obviously September 2013 -- all

6   the way up to April 2014, but not including the

7   subsequent collection agency, Veripro Solutions,

8   getting involved as well, too.

9           MS. FULLER:  Do you mind if we take a quick

10  break?

11          MS. SCHMIDT:  Yes.  Sure.

12          MS. FULLER:  I just need to use the restroom.

13          MS. SCHMIDT:  Yes.  No problem.

14              (A short break was taken.)

15  BY MS. SCHMIDT:

16      Q.   So we're back on the record.  I think we were

17  last talking about the misrepresentations that

18  Bank of America and Nationstar had made.  I am going to

19  move on to page 9 of your complaint.  This is your

20  claim for civil conspiracy.  In paragraph 64, it

21  indicates that defendants engaged in a successful

22  conspiracy to commit unlawful acts against plaintiff.

23          Why do you believe that Nationstar -- or

24  what's the basis for your belief that Nationstar and

25  Bank of America are working in concert?

Michael Bondi

41

1      MS. FULLER: Objection. Calls for a legal
2  conclusion.
3      Go ahead.
4      THE WITNESS: Well, I believe, in my opinion,
5  a conspiracy exists when two or more person -- or
6  persons get together to successfully -- whether this is
7  a civil action or criminal action, the whole basis of a
8  conspiracy is when two or more persons come together
9  trying to do something that they should not have done,
10  and that they may know is either illegal or immoral,
11  and they're successful with it by grouping together.
12  And, you know, one person tells another person -- or in
13  this case, one company tells another company that I owe
14  them money, when I do not, and they have proof of that.
15  Even though they ignore that proof and they still rely
16  on the -- Bank of America telling Nationstar that I owe
17  them money. So the conspiracy, I believe, is complete
18  when Nationstar failed to investigate my mortgage or
19  history or credit reports or any evidence that I had
20  and decided to run with it, and still charge me off,
21  even though they were basing their conclusions on
22  information that was not supplied to them.
23      MS. FULLER: Are you done with the complaint?
24      MS. SCHMIDT: Yes.
25  \\

42

1  BY MS. SCHMIDT:
2      Q.   I'm going to go through some of your damages
3  that you're claiming in this action. And one of them
4  was the loss of home loan and equity for $230,000. Can
5  you describe for me which home loan and what equity you
6  are referring to?
7      A.   Well, if I would have successfully purchased a
8  home in 2013, let's say for $180,000, that home right
9  now easily has appreciated 40 or $50,000. So that loss
10  equity would have been built in if I had moved into
11  that house back in 2013 before all this transpired.
12      Q.   And I think you've already answered this, but
13  I can't remember the answer. Did you have a specific
14  property that you were going to purchase in that
15  timeframe?
16      A.   No, I did not.
17      Q.   And the second one is loss of business
18  opportunity for $102,000. Can you describe to me the
19  business opportunity that was lost?
20      A.   Well, my business, since I'm self-employed, is
21  run on credit. So if I don't have credit to advertise,
22  like let's say on Zillow.com or, you know, some search
23  engine optimization or anything like that on my
24  website, I'm not obviously meeting new clients, I'm not
25  producing a good salary like I was. My business has

43

1  suffered for the past year and a half to two years that
2  I have been fighting this, taking time off, gathering
3  the evidence, writing things out, scanning documents.
4  All of this has taken away time away from my business,
5  but more or less not having the ability to have credit
6  to advertise. The credit that was actually taken away
7  from me because of the negative credit ratings that I
8  received, I wasn't able to advertise like I normally do
9  for my business.
10      Q.   How did you calculate the $102,000 figure?
11      A.   I did averages of my past 1099s and years of
12  what I made. And so I thought that was a fair way of
13  calculating what I would have made. And also, the
14  market has been stable out here. So talking to other
15  realtors in the valley, my broker, things like that,
16  there hasn't been a depreciation of buyers or sellers
17  or anything like that. So the market has been pretty
18  stable. So there should have been no reason why I
19  could not have continued to make what I made in the
20  past couple of years.
21      Q.   Okay. And then one other thing that I flipped
22  through is car lease extension due to loss of credit.
23  Can you describe that one for me?
24      A.   Yeah. My lease on my 2012 Mercedes was -- I
25  think it was due in -- oh, when was that? I gave you a

44

1  copy. I forget if it was in 2014. It was -- it was
2  due somewhere in 2014. And I had gone to Mercedes and
3  I said, Hey, what can I do now that my credit is
4  screwed up? Is that going to affect me? And they
5  said, Yes, it could. If you decide to buy the car, you
6  are going to have a higher interest rate. You know,
7  you are going to have higher terms based on your
8  credit. I said, Well, okay. Well, what other remedies
9  do I have? And the finance manager at Fletcher Jones
10  basically said to me, Why don't you just extend your
11  lease for a couple of months and see if that will
12  resolve your credit issues? So I just prepaid the six
13  month extension. So it was at $2,300, $2,400,
14  something like that.
15      Q.   And so did -- it's listed at about
16  $3,299.32 --
17      A.   Or maybe that was that -- yeah. It was $452 a
18  month times six, something like that.
19      Q.   Okay. So that --
20      A.   So whatever that -- whatever that figure is.
21      Q.   So that also includes the lease payment?
22      A.   Yeah.
23      Q.   Okay.
24      A.   Yes.
25      Q.   Then another thing that's -- well, let me ask

45

1 you this:  Did you attempt to qualify for a loan at
2 that time to determine what the terms would have been
3 had you tried to purchase the car in 2014?
4     A.  From -- from all the people that I had talked
5 to, there would have been no reason to even try.
6     Q.  Okay.
7     A.  I went from, what, a 762 to a 601 or a 602.
8 It was that -- and the other thing, too, is since my
9 business started to decline, obviously I'm not making
10 money.  So now I'm utilizing what's left on my credit,
11 so now my balances are a lot higher than what I had.
12 So I incurred more debt because I wasn't earning as
13 much.  So I had all these negatives hit me at once.
14     Q.  The next one item is decrease of credit limits
15 in the amount of $20,560.  Can you describe for me
16 those damages?
17     A.  American Express had literally -- I think the
18 next day -- I think everything happened on -- what was
19 it, May -- or no.  April 13th or something like that.
20 And then I want to say April 14th, I got an e-mail
21 alert from American Express, and I also got a letter in
22 the mail from them that says they had declined -- they
23 had decreased my credit limits.  I'm trying to think.
24 U.S. Bank had also done it, Chase had done it.  Oh,
25 there's a whole list of things that I provided to you

46

1 that can actually -- you can actually see the decreases
2 of credit from all of those.
3     Q.  Okay.  So the $20,560 figure is an aggregate,
4 like adding up of how much all your credit limits had
5 been lowered?
6     A.  Yes.
7     Q.  Okay.
8     A.  Yes.
9     Q.  And what did you use those credit limits for?
10     A.  Some of it's for business, some of it's for
11 personal use.  It really depends.  For advertising
12 costs, general business costs, buying of equipment,
13 computers, things like that.
14     Q.  The next item is loss of tax credits/interest
15 deductions on housing, $10,400.  Can you describe for
16 me what that is?
17     A.  I just calculated what an average new -- house
18 payment would have been and deducting the interest for,
19 what, a year, year and a half -- or whenever that
20 damage was assessed.
21     Q.  And that's if you would have purchased a house
22 back in --
23     A.  2013, yes.
24     Q.  Correct.  Okay.
25         Then the next item is increased debt,

47

1 $29,605.13.  Can you describe that for me?
2     A.  Yes.  Since my -- subsequent business wasn't
3 producing commission checks due to the limitations
4 imposed on me on the lower credit scores.  My business
5 suffered.  So, you know, my credit -- I was just using
6 credit to sub -- subsidize regular monthly expenses on
7 business and personal use, things like that.  Since,
8 obviously, I didn't have income coming in --
9     Q.  Okay.
10     A.  -- to match what my normal income would have
11 been.
12     Q.  Do you have any other damages that you have
13 suffered that you can think of that weren't in that
14 list that we just went through?
15     A.  I want to say emotional stress, health issues
16 that I have.  That doesn't really help matters.
17     Q.  Have you seen a doctor related to the
18 emotional stress or your health issues?
19     A.  Yeah.  I'm actually under doctor's care for
20 numerous things.
21     Q.  And when did you begin seeing a doctor for the
22 emotional stress and health issues related to --
23     A.  Well, this is going back to 2011.
24     Q.  And did your doctors indicate that this
25 financial stress was one of the causes of your

48

1 symptoms?
2     A.  Yes.
3     Q.  And what were some of those symptoms?
4     A.  I have bronchitis related asthma that
5 sometimes can be stress induced.  And I have had
6 several asthma attacks since.  If I get overly
7 stressed -- I also suffer from Stage 2 kidney disease.
8 So I'm under that doctor's care.  I also had my
9 gallbladder taken out.  So I have subsequent stomach
10 related issues.  So that -- if sometimes stress builds
11 up, I get severe stomach pains that are in relation to
12 the loss of my gallbladder.
13     Q.  With respect to the asthma, when were you
14 first diagnosed with asthma?
15     A.  I would guestimate it was about -- it was when
16 I moved out here, but I would say -- I'm -- I'm
17 estimating 2006, 2007.  Honestly, I don't remember an
18 exact timeframe.
19     Q.  With respect to the Stage 2 kidney disease,
20 when were you diagnosed with that?
21     A.  Once again, I would estimate 2012, 2013.
22     Q.  I apologize, but I don't know very much about
23 it.  But does it start at Stage 1?
24     A.  No.  It -- your symptoms like if -- like
25 Stage 5 is you're on dialysis weekly.  So I'm Stage 2.

Michael Bondi

49

1  I'm Stage 2 because I had a near death experience, and
2  I was resuscitated twice and brought back to life and
3  all that good stuff. And subsequently, my kidneys did
4  not receive oxygen for about four and a half minutes
5  while they were resuscitating me, and so I had some
6  type of permanent kidney damage. Like a normal kidney
7  function is above 90. I'm at like 61. So that equals
8  like the Stage 2.
9      Q.  Okay. So the kidney disease resulted from
10  a -- like a near death experience?
11     A.  Yes.
12     Q.  Okay. And then the stress related to your
13  credit issues exacerbates some of the symptoms?
14     A.  It's more or less my stomach issues related to
15  the loss of my gallbladder and also my asthma. The
16  kidney's disease is unfortunately just a negative
17  outcome of -- of the gallbladder attack that I had and
18  the near death experience. So, yeah. I mean, it's
19  like one -- if one didn't happen, the other one
20  wouldn't have happened, obviously.
21     Q.  Okay. And then punitive damages are listed at
22  $1,565,593.35. Did you calculate that?
23     A.  No.
24     Q.  And then lastly, statutory damages are listed
25  at $126,000. Did you calculate that figure?

50

1      A.  I think I calculated some of it as far as the
2  credit violations go. I don't know about the actual
3  United States code related to the actual statute
4  damages.
5      Q.  Okay. And just kind of going back to some of
6  the allegations in your complaint where you indicated
7  that -- we'll start with Bank of America.
8  Bank of America made false statements. Were any of
9  those false statements made to you?
10     A.  Yeah -- well, depends on what you consider a
11  false statement. If somebody -- in my mind, I don't
12  think they were false statements. I think they were
13  true -- true statements. So it's kind of hard to
14  respond to that question. If somebody tells me I have
15  a zero balance, then I take their word for it, that
16  they're representing Bank of America, so I don't
17  necessarily think that would be a false statement.
18     Q.  Okay.
19     A.  So if you want to rephrase -- or the
20  question --
21     Q.  No. I was just trying to figure out the false
22  statements that were made and whether or not they were
23  made to you.
24         And did you take any action in reliance on the
25  statements made by Bank of America to you regarding the

51

1  zero balance?
2      A.  Yeah. Absolutely. If somebody tells me I
3  have a zero balance, I'm taking their word for it.
4  Plus the credit reporting that they did for almost four
5  years. So, you know, it -- to me, obviously that made
6  sense to me that I was done with this, that I was never
7  going to have to deal with this ever again. I had
8  dealt with it for -- from 2007 to 2010. But then from
9  2010 to 2013, everything, you know, was great. And
10  then July 2013 hit, and everything started falling
11  apart again. So in my mind I'm thinking, Is this ever
12  going to end? Why is it resurfacing when they have
13  been reporting me and telling me I had been -- I have a
14  zero balance? They put it in writing several times.
15         Even Nationstar put it in writing several
16  times saying, Hey, yeah, we agree with you. I mean,
17  the letters were pretty specific. They said very
18  clearly -- before they even charged me off, we were
19  talking, what, September 2013 all the way up to
20  April 2014, they agreed with me. So what is that?
21  That's four months -- that's almost, what, eight months
22  that they actually agreed with their letters, and then
23  all of a sudden something clicked. And then all of a
24  sudden, I now owe $69,371.
25     Q.  Okay. And so now with Nationstar, can you

52

1  just sort of describe to me what are the false
2  statements that Nationstar has made to you?
3      A.  Well, the false statements would have been the
4  subsequent reporting of the major charge-off and
5  derrogatories, and the false statements made to Veripro
6  Solutions, which was their internal collection agency.
7  And those would technically be false, especially when
8  they sent me letters saying that I had a zero balance.
9      Q.  Did you rely on the statements made by
10  Nationstar in any way? Did you take any action or --
11     A.  Yes. The action that I took was, you know,
12  keeping those letters stating I had a zero balance and
13  informing my attorney that they were going to resolve
14  this. That we -- you know, we're trying to resolve
15  this without going to trial or without going -- seeking
16  litigation, that we were are trying to come up with
17  some type of resolution, which I felt that Nationstar
18  was trying to resolve those for me. And they're -- by
19  sending those letters, by the phone calls, the
20  different representatives that I worked with, that all
21  those statements were going to be true, but they later
22  turned out to be false statements.
23     Q.  Do you check your credit reports fairly
24  regularly?
25     A.  Yes.

Michael Bondi

53

1      Q.   Can you estimate about how often you check
2  them?
3      A.   Since I have been dealing with this, I would
4  say once a month.  I subscribe to a service that gives
5  me alerts.  That's how I discovered the charge-off from
6  Nationstar, was through an e-mail alert.  So I monitor
7  my credit for years.
8      Q.   Okay.
9      A.   So, yeah, I'm pretty informed on that.
10     Q.   So even before all this happened, you had
11 monitored your credit fairly closely?
12     A.   Yes.
13     Q.   Okay.  And I just have a couple more things.
14 So don't be --
15     A.   Hey, it is what it is.
16     Q.   -- put off by the paperwork in front of you.
17 But I want to just go through the letters.  And so they
18 start on the Bates number in the -- on the bottom
19 right-hand corner.  It starts at BONDI RFP3-00001.
20     A.   Which folder is it in?
21     Q.   I believe it will be in the first one.
22     A.   Okay.  So, I'm sorry.  So it's RFP -- which
23 one?
24     Q.   3 -- it might be pretty deep in there, too.
25     A.   3 -- okay.  I'm on the 345.

54

1      Q.   Okay.  So it will be a little bit before that
2  I think.
3      A.   Oh.  What was the number again?
4      Q.   RFP3-000001.
5      A.   Okay.
6          MS. FULLER:  Smaller binders would have been
7  better.
8          MS. SCHMIDT:  Yes.  I agree with that
9  assessment.
10         MS. FULLER:  You weren't kidding when you said
11 there were a lot of documents there.
12 BY MS. SCHMIDT:
13     Q.   All right.  So let's see.  I'm trying to find
14 the -- well, I guess I will just start at the beginning
15 and kind of briefly go through all the letters.
16         So the first letter is dated June 12, 2014.
17 And it indicates -- it's essentially confirming receipt
18 of correspondence on May 15, 2014.  Do you recall if
19 you received this letter by mail or electronically?
20     A.   I believe I got this in the mail.
21     Q.   And did you ever --
22     A.   Or by e-mail, too -- I think.
23     Q.   Okay.
24     A.   I mean, it's got the correct address and it's
25 got my e-mail at the bottom, so it could have been

55

1  both.
2      Q.   Okay.  Did you ever speak to -- I'm going to
3  guess on this name, Laquinte Proby.
4          MS. SCHMIDT:  And for the court reporter
5  that's L-a-k-u-i-n-t-e, last name Proby, P-r-o-b-y.
6          MS. FULLER:  It's actually Q-u.  You said K.
7  BY MS. SCHMIDT:
8      Q.   Oh, Q-u.  I apologize.
9      A.   I honestly do not recall speaking to her.  I
10 could have.  I mean, I have spoken with a lot of
11 people.  But I don't recall her specifically.
12     Q.   And then on the next page, Bates stamped BONDI
13 RFP3-2, this appears to be a letter to Leslie Lewis
14 with Senator Harry Reid's office.  Did you contact
15 Senator Harry Reid's office to assist you with the
16 issues you were having?
17     A.   Yes, I did.
18     Q.   And do you recall on this letter whether you
19 received it by mail or e-mail, or both?
20     A.   I would want to say the bulk of the letters I
21 believe came in via U.S. mail from Nationstar.  Some
22 did come from e-mail, but I don't remember particularly
23 on this one.
24     Q.   And I'm looking on the second page.  It's
25 signed by a Crystal Wills, W-i-l-l-s.

56

1      A.   Yes.
2      Q.   Did you have any contact with Crystal Wills?
3      A.   I believe I did.  Her name does sound familiar
4  to me.  I believe she sent me several correspondence
5  and I -- I think I might have talked to her on the
6  phone.  I don't remember 100 percent if I did or not.
7      Q.   Okay.  I'm going to skip ahead.  Going to
8  what's marked as BONDI RFP328.  I'm paging through
9  these.  It's Bates stamped 28 through 35.  They appear
10 to be screen shots from an e-mail.  Were these e-mails
11 that you had received?
12     A.   Yes.
13     Q.   And are these the e-mails that you were
14 referencing, the secured e-mails that you no longer
15 have access to?
16     A.   Yes.  It's -- it's kind of hard for me to say
17 100 percent that they are or they aren't, just because
18 I can't access them.  So I don't know specifically if
19 they are those e-mails or not, because it locks me out
20 of it.  And I can't -- the only way I was even able to
21 do this was to do a screen shot of it because the
22 e-mail is so old that it won't open up in the newer
23 mail client that I am using.  So I had to literally do
24 a screen shot of it and save it as a JPEG to get to
25 that result.

Michael Bondi

57

1    Q.  Okay.  And then so the next letter would be
2  RFP3-36.  And this letter is dated September 6, 2013.
3  Do you recall if you received this letter by e-mail or
4  U.S. mail?
5    A.  I believe both.  When I dealt with David, him
6  and I e-mailed each other a lot, and he also sent me
7  correspondence via U.S. mail.
8    Q.  And do you recall the timeframe that you
9  received this letter?
10   A.  It's dated December 6, 2013.  So that would
11  probably be somewhere right around -- somewhere in the
12  middle of September, maybe, or sooner.
13   Q.  And did you contact David in response to
14  receiving this letter, David Grasham (phonetic)?
15   A.  Grasham, yeah.  Him and I had numerous phone
16  calls and e-mails together.  He was supposed to be my
17  point of contact with Nationstar.  There was somebody
18  else -- I want to say his name was Snow or somebody, I
19  forget, but he didn't work for Nationstar or anything
20  like that.  And then they transferred me to David.  So
21  it was David, and then I think his manager is John
22  Scott that I was communicating with.
23   Q.  Then the next one on RFP3-37 --
24   A.  Uh-huh.
25   Q.  -- it's a letter dated May 27, 2014, signed by

58

1  Crystal Wills.  Did you have contact with Crystal
2  around the time that you received this letter?
3    A.  Like I said, her name is familiar.  I --
4  honestly, I could have or I could not have.  I -- I
5  honestly don't remember.  I definitely know that I
6  spoke with David and I definitely spoke with John, and
7  I also spoke with a lady in the Office of the
8  president named Sarah.  As far as anybody else from
9  Nationstar, I probably did.  But I -- like I said, I
10  have spoken to so many people.  I don't want to say
11  100 percent yes to something.
12   Q.  Okay.  All right.  Do you recall having
13  contact with a John Scott?
14   A.  Yes.
15   Q.  Did you e-mail with John Scott or did you
16  call, or both, or what do you recall?
17   A.  I think it was both.
18   Q.  Okay.  And the last one that I would like to
19  ask you about is RFP3-43.  This is dated January 13,
20  2014, from Veripro Solutions, V-e-r-i-p-r-o.  And it's
21  signed by a Phillip Livingston.  Did you have contact
22  with Phillip Livingston during this time frame?
23   A.  Yes, I did.
24   Q.  And would you e-mail Phillip or call him, or
25  both?

59

1    A.  He -- I believe he called me and he also -- he
2  e-mailed me this letter.
3    Q.  Okay.
4    A.  And I think I might have talked to him once or
5  twice on the phone, but he e-mailed me this letter.
6  And then he also sent it in the mail as well, too.
7    Q.  And do you recall --- did you receive this
8  letter in response to a request, a request from you?
9  Did you request that he send you something in writing
10  about your account?
11   A.  Yes, I did.  I requested it when Nationstar
12  told Veripro that, Hey, you owe $69,596.26.  That's
13  when I started reaching out to Veripro and sent
14  certified letters to Veripro saying, Hey, hold off.
15  Here are the letters from Nationstar that clearly said
16  I don't owe anything.  Can you please rectify this?
17  And that's when talking to some of Veri -- I don't
18  remember the Veripro reps by name, but I know I
19  definitely spoke with Phillip at least twice on the
20  phone.  And he said he would correct this, and send me
21  a letter stating that I had a zero balance.
22   Q.  Have you produced all the evidence that you
23  have against Bank of America and Nationstar in this
24  case to your attorney?
25   A.  Yes.  To my knowledge, yes.

60

1    Q.  Okay.  So there's no other documents or
2  anything that you have in your possession that you
3  haven't produced?
4    A.  No.
5    Q.  Okay.
6        MS. SCHMIDT:  I don't have any other
7  questions.
8        MS. FULLER:  Okay.
9        MS. SCHMIDT:  You're all set.
10       THE WITNESS:  Cool.
11       MS. SCHMIDT:  All right.  Thanks.
12  I'm going to take an electronic copy.
13       MADAM REPORTER:  Did you want a copy,
14  Ms. Fuller?
15       MS. FULLER:  Yes.  And he will review and
16  sign.
17       (Thereupon, the deposition concluded at
18         12:12 p.m.)
19
20
21
22
23
24
25

```
 1              CERTIFICATE OF REPORTER
 2   STATE OF NEVADA  )
     COUNTY OF CLARK  )
 3       I, Michelle R. Ferreyra, a Certified Court
 4   Reporter licensed by the State of Nevada, do hereby
 5   certify:  That I reported the deposition of MICHAEL
 6   BONDI, commencing on WEDNESDAY, MARCH 9, 2016, at
 7   10:36 a.m.
 8       That prior to being deposed, the witness was
 9   duly sworn by me to testify to the truth.  That I
10   thereafter transcribed my said stenographic notes into
11   written form, and that the typewritten transcript is a
12   complete, true and accurate transcription of my said
13   stenographic notes, and that a request has been made to
14   review the transcript.
15       I further certify that I am not a relative,
16   employee or independent contractor of counsel or of any
17   of the parties involved in the proceeding, nor a person
18   financially interested in the proceeding, nor do I have
19   any other relationship that may reasonably cause my
20   impartiality to be questioned.
21       IN WITNESS WHEREOF, I have set my hand in my
22   office in the County of Clark, State of Nevada, this
23   21st day of March, 2016.
24
25   MICHELLE R. FERREYRA, CCR No. 876
```